STATE OF NORTH CAROLINA v. RENWICK GIBBS

No. 1A92

(Filed 5 November 1993)

**1. Criminal Law § 353 (NCI4th) — first-degree murder — defendant in handcuffs — juror excused — other prospective jurors not examined or cautioned**

The trial court did not err in a first-degree murder prosecution where a prospective juror was asked, in the presence of two other prospective jurors, whether he accepted the principle that defendant was presumed innocent; the prospective juror indicated that he had seen defendant in handcuffs and this caused him to believe defendant was dangerous, needed the handcuffs, and, therefore, was guilty; the court excused that juror; defendant did not request curative instructions or move for a mistrial but merely excepted to the court's excusing that prospective juror; and the court did not give any remedial, curative, or cautionary instruction to the other prospective jurors. The court had excused the prospective juror, thereby repelling any inference that the court concurred with his opinion that defendant was guilty, and the judge then asked the two remaining prospective jurors whether they had any opin-

1

ion which would affect their ability to render a fair and impartial verdict.

**Am Jur 2d, Criminal Law §§ 844-846; Jury § 294.**

2. **Jury § 102 (NCI4th)— first-degree murder—prospective juror with opinion—excused—remaining prospective jurors not instructed—no error**

The trial court did not err during jury selection in a first-degree murder prosecution by failing to give a cautionary instruction to the remaining venire after a prospective juror with an opinion on guilt or innocence was excused. Defendant did not request any instruction and the court's excusal of the prospective juror repelled any inference of concurrence with his opinion.

**Am Jur 2d, Jury §§ 294-305.**

**Cure of prejudice resulting from statement by prospective juror during voir dire, in presence of other prospective jurors, as to defendant's guilt. 50 ALR4th 969.**

3. **Jury § 102 (NCI4th)— first-degree murder—jury selection— preconceived opinion—excusal without determination of whether opinion could be set aside—no error**

The trial court did not err during jury selection in a first-degree murder prosecution by excusing a prospective juror for cause on its own motion where the juror stated that she had formed an opinion about the case. Although defendant contended that the court failed to exercise its discretion by failing to determine whether the juror could lay aside her opinion and render a verdict based on the evidence, the statement of the prospective juror that she had formed an opinion about the case supported the finding by the court that she could not be impartial.

**Am Jur 2d, Jury §§ 294-305.**

**Cure of prejudice resulting from statement by prospective juror during voir dire, in presence of other prospective jurors, as to defendant's guilt. 50 ALR4th 969.**

4. **Jury § 227 (NCI4th)— death qualifying jury—opposition to death penalty—excusal for cause—no error**

The trial court did not err during jury selection in a first-degree murder prosecution by excusing for cause a pro-

spective juror whose responses indicated that she opposed the death penalty and that her view would interfere with the performance of her duties as a juror in the sentencing phase.

**Am Jur 2d, Jury §§ 289, 290.**

**Comment Note — Beliefs regarding capital punishment as disqualifying juror in capital case — post-Witherspoon cases. 39 ALR3d 550.**

5. **Jury § 217 (NCI4th) — first-degree murder — jury selection — death qualifying — minister excluded — no error**

The trial court did not err during jury selection in a first-degree murder prosecution by excusing for cause a Pentecostal minister whose bias against the death penalty was shown with unmistakable clarity.

**Am Jur 2d, Jury §§ 289, 290.**

**Comment Note — Beliefs regarding capital punishment as disqualifying juror in capital case — post-Witherspoon cases. 39 ALR3d 550.**

6. **Jury § 227 (NCI4th) — first-degree murder — jury selection — death qualifying — excusal for cause**

The trial court did not err during jury selection in a first-degree murder prosecution by granting the State's motion to excuse a juror for cause due to her views on capital punishment where some of her answers were equivocal, but her views on capital punishment would have substantially impaired her ability to perform her duties as a juror in accordance with her oath.

**Am Jur 2d, Jury §§ 289, 290.**

**Comment Note — Beliefs regarding capital punishment as disqualifying juror in capital case — post-Witherspoon cases. 39 ALR3d 550.**

7. **Jury § 226 (NCI4th) — first-degree murder — jury selection — death qualifying — no opportunity to rehabilitate**

The trial court did not err during jury selection for a first-degree murder by denying defendant the opportunity to rehabilitate two prospective jurors, Moore and Boston, excused for cause based on their answers to death qualification questions where defendant does not argue and the record does

not show that the court made a blanket refusal to permit rehabilitation of any jurors; defendant made no showing in the trial court and does not show on appeal how further questioning would have elicited different answers from Moore; and Boston's unequivocal answers compel the conclusion that further questioning would not have elicited different answers.

**Am Jur 2d, Jury §§ 289, 290.**

**Comment Note — Beliefs regarding capital punishment as disqualifying juror in capital case — post-Witherspoon cases. 39 ALR3d 550.**

8. **Criminal Law § 832 (NCI4th) — first-degree murder — instructions on accomplice testimony — erroneous — no plain error**

There was no plain error in a first-degree murder prosecution where the prosecutor asked several questions related to accomplice testimony during jury selection; the court on its own motion gave an erroneous instruction which equated the interest of an accomplice with that of any other witness; defendant failed to object; the court correctly instructed the jury on how to consider testimony pursuant to a plea arrangement before the accomplice testified; and, the court instructed correctly on how to consider accomplice testimony and again on how to consider testimony pursuant to a plea arrangement when charging the jurors prior to their deliberations on guilt. Viewing the entire record, defendant has failed to show plain error arising from the court's preliminary instruction on accomplice testimony.

**Am Jur 2d, Trial §§ 1167, 1225.**

9. **Jury § 147 (NCI4th) — first-degree murder — jury selection — statements by prosecutor involving possibility of penalty phase — no gross impropriety**

There was no gross impropriety during jury selection in a first-degree murder prosecution where defendant argues that language prefacing some of the prosecutor's questions constituted a comment that there was a good possibility the defendant would be found guilty but the prosecutor never stated that the sentencing phase was certain to be reached; defense counsel elicited from most seated jurors an understanding that the penalty phase would not necessarily be reached; and the court repeatedly instructed the venire and the jury that there

would be a separate sentencing proceeding only if defendant was convicted. A fair reading of the prosecutor's statements shows that, like those of the court, they simply refer to the conditional nature of bifurcated capital prosecutions; nothing in the statements themselves suggests that the prosecutor was attempting to place before the venire prejudicial matters by injecting his own beliefs or personal opinions unsupported by evidence; and, after reviewing the entire *voir dire*, the Supreme Court was satisfied that the repetitions did not constitute such an attempt.

Am Jur 2d, Jury § 203.

Propriety and effect of asking prospective jurors hypothetical questions, on voir dire, as to how they would decide issues of case. 99 ALR2d 7.

10. Jury § 118 (NCI4th)— first-degree murder—jury selection— prosecutor's comments—no prejudice

Defendant did not show either an abuse of discretion or prejudice arising therefrom in a first-degree murder prosecution where defendant contended that the court erred during jury selection by twice overruling his objection to the prosecutor's language, which allegedly implied that the jurors could not be fair to their country and state and also be fair to the defendant.

Am Jur 2d, Jury §§ 201, 202.

11. Criminal Law § 412 (NCI4th)— first-degree murder—opening statements—prosecutor's comments—no error

The trial court did not abuse its discretion in a first-degree murder prosecution by permitting the prosecutor in his opening statement to imply twice that the jurors could not be fair to both the defendant and the State.

Am Jur 2d, Trial §§ 522, 544, 554.

12. Constitutional Law § 262 (NCI4th)— first-degree murder— Sixth Amendment right to counsel—attachment at first appearance

The trial court did not abridge a first-degree murder defendant's Sixth Amendment right to counsel by denying defendant's motion to suppress where suppression hearing testimony showed that defendant agreed to undergo a polygraph

**STATE v. GIBBS**

[335 N.C. 1 (1993)]

examination and went with two officers to be tested on the morning of 31 May 1990; defendant confessed to the polygraph operator within minutes of having completed the test; defendant confessed to the two officers shortly thereafter and assisted them in recovering a rifle; defendant returned with the officers to the police department in Washington, where, beginning about 3:45 p.m., he sat in an interview room with an agent; hair samples and fingerprints were taken, and defendant was told at 6:32 p.m. that he was going to be charged with the murders; defendant was not questioned while sitting in the interview room; there was conversation unrelated to this crime and other agents went in and out of the interview room; defendant was permitted to use the toilet and provided with a soft drink upon his request; he was taken to the magistrate's office soon after 6:32 p.m., where arrest warrants were served on him, and then returned to the police department; the SBI agent who had sat with defendant testified that defendant asked if he had to get an attorney about 15 minutes before he was taken to the magistrate's office; defendant was told that getting an attorney would be his decision and that an attorney would be appointed upon his request if he could not afford one; defendant was read his rights at about 8:15 and waived those rights; and defendant called officers to his cell on 3 June, waived his rights again, and made a detailed confession. The Supreme Court elected to consider defendant's Sixth Amendment arguments in the exercise of the utmost diligence in a capital case even though they were not raised at trial. Defendant's Sixth Amendment right to counsel attached during his first appearance on 4 June, when the State's position against him solidified as to the murder charges and counsel was appointed, and the interviews on 31 May and 3 June were not protected by the Sixth Amendment right. N.C.G.S. § 15A-601.

Am Jur 2d, Criminal Law §§ 732 et seq., 967 et seq.

Duty to advise accused as to right to assistance of counsel. 3 ALR2d 1003.

Accused's right to assistance of counsel at or prior to arraignment. 5 ALR3d 1269.

Accused's right to counsel under the Federal Constitution—Supreme Court cases. 18 L. Ed. 2d 1420.

13. **Evidence and Witnesses § 1252 (NCI4th)— first-degree murder—Fifth Amendment right to counsel—invocation**

The trial court did not err in a first-degree murder prosecution by denying defendant's motion to suppress confessions on the grounds that the confessions were admitted in violation of defendant's Fifth Amendment right to counsel where the State concedes that defendant was in custody; the trial court found that defendant was not interrogated at the time he asked about an attorney; defendant must have known arrest was imminent; the SBI agent with defendant made no attempt to dissuade defendant from exercising his right to have an attorney present during custodial interrogation; and defendant did not ask for an attorney when told the court would appoint an attorney to represent him if he asked for one. Based on the entire context in which defendant's inquiry was made, he did not invoke the right to counsel.

Am Jur 2d, Criminal Law §§ 732 et seq., 967 et seq.

Duty to advise accused as to right to assistance of counsel. 3 ALR2d 1003.

Accused's right to assistance of counsel at or prior to arraignment. 5 ALR3d 1269.

Accused's right to counsel under the Federal Constitution—Supreme Court cases. 18 L. Ed. 2d 1420.

14. **Conspiracy § 38 (NCI4th)— conspiracy to commit first-degree murder—evidence sufficient**

The trial court did not err by failing to dismiss a charge of conspiracy to commit burglary where defendant was also charged with conspiracy to commit first-degree murder and defendant contended that the evidence showed one agreement to commit multiple offenses, but the evidence, taken in the light most favorable to the State, showed a separate agreement to commit burglary.

Am Jur 2d, Conspiracy § 29.

15. **Conspiracy § 14 (NCI4th)— conspiracy to commit first-degree murder and first-degree burglary—instructions—no plain error**

There was no plain error in the court's instructions on conspiracy to commit first-degree murder and first-degree burglary where the court told the jury that defendant had

STATE v. GIBBS

[335 N.C. 1 (1993)]

to have agreed with at least one other person to commit each crime instead of the person named in the indictment, but there was no basis to believe the error had a probable impact on the verdicts.

**Am Jur 2d, Conspiracy § 10.**

16. **Conspiracy § 43 (NCI4th)— conspiracy to commit burglary— instructions—misstatement—no plain error**

There was no plain error where the trial court, when instructing on conspiracy to commit first-degree burglary, twice referred to conspiracy to commit first-degree murder, with which defendant was also charged, but acknowledged the error and gave a correct instruction.

**Am Jur 2d, Trial § 1481.**

17. **Conspiracy § 39 (NCI4th)— conspiracy to commit first-degree murder—instructions on felony murder—no prejudice**

There was no prejudice where defendant contended that the trial court erroneously instructed the jury that it could convict him of conspiracy to commit murder if they found an agreement to commit felony murder, but the jurors eliminated the possibility that an unintentional felony murder formed the basis for the specific intent underlying the conspiracy of which they convicted defendant when they found an agreement to kill. Moreover, since the jurors also found defendant guilty of three counts of murder by reason of premeditation and deliberation, there is no rational basis for suggesting they could have found that the murders which occurred during the burglary were unintentional felony murders.

**Am Jur 2d, Trial § 1482.**

**Modern status of law regarding cure of error, in instruction as to one offense, by conviction of higher or lesser offense. 15 ALR4th 118.**

18. **Burglary and Unlawful Breakings § 165 (NCI4th)— first-degree burglary—misdemeanor breaking or entering as lesser offense—not submitted—no error**

The trial court did not err by refusing to instruct on misdemeanor breaking or entering as a lesser offense to first-degree burglary where, notwithstanding defendant's after-the-fact assertions, overwhelming evidence showed that defendant

had decided to kill his estranged wife's family prior to breaking into the house and there is no before-the-fact evidence to which defendant's statements afterwards could lend credence. There was no evidence from which a rational trier of fact could have concluded defendant did not possess the intent to commit murder.

Am Jur 2d, Trial § 1427.

Propriety of lesser-included-offense charge to jury in federal criminal case—general principles. 100 ALR Fed. 481.

19. Burglary and Unlawful Breakings § 151 (NCI4th)— burglary— instructions—intent—no plain error

There was no plain error where the burglary indictment charged that defendant broke and entered with the intent to commit the felony of first-degree murder, defendant argues that the court erroneously instructed that the State would have met its burden of proving the element of intent as to burglary if felony murder were proven by the State, and the jurors found defendant guilty of premeditated and deliberated murder.

Am Jur 2d, Burglary § 69.

20. Criminal Law § 1355 (NCI4th)— first-degree murder—mitigating circumstances—no significant history of prior criminal activity

The trial court did not err at a sentencing proceeding for first-degree murder by not submitting the mitigating circumstance of no significant history of prior criminal activity where the record shows that defense counsel stated that no evidence of defendant's criminal history was presented by the defense or the State and the defense had chosen not to request submission of the circumstance. N.C.G.S. § 15A-2000(f)(1).

Am Jur 2d, Criminal Law § 598 et seq.

21. Criminal Law § 1362 (NCI4th)— first-degree murder— mitigating circumstances—age of defendant—no error

Defendant could not have been prejudiced when being sentenced for first-degree murder by the court's instruction on the age of defendant at the time of the crime, which defendant contended limited the circumstance to his chronological

age, twenty-six, because the jurors found that this mitigating circumstance existed. N.C.G.S. § 15A-2000(f)(7).

**Am Jur 2d, Criminal Law § 598 et seq.**

22. **Criminal Law § 1339 (NCI4th) — first-degree murder — aggravating circumstances — multiple circumstances — separate evidence**

The trial court did not err when sentencing defendant for first-degree murder by submitting as aggravating circumstances for each murder both that the murder was committed during the course of a felony (burglary), and that it was part of a course of conduct which involved commission of other crimes of violence against other persons. Different evidence supported each aggravating circumstance and, on the peculiar facts of the instant case, the two circumstances were not inherently duplicative. N.C.G.S. § 15A-2000(e)(5); N.C.G.S. § 15A-2000(e)(11).

**Am Jur 2d, Criminal Law § 598 et seq.**

**Sufficiency of evidence, for death penalty purposes, to establish statutory aggravating circumstance that murder was committed in course of committing, attempting, or fleeing from other offense, and the like — post-Gregg cases. 67 ALR4th 887.**

23. **Criminal Law § 1344 (NCI4th) — first-degree murder — aggravating circumstances — especially heinous, atrocious or cruel — evidence sufficient for submission**

The evidence was sufficient in a first-degree murder sentencing proceeding to support submitting to the jury the aggravating circumstance that the killing of Shamika Farris was especially heinous, atrocious, or cruel where the murders were committed according to a calculated plan; the victims, including Shamika, were part of defendant's extended family; defendant's statements showed that while Shamika's mother pleaded with defendant not to hurt them, invoking the family relationship, her daughter yelled and cried louder and louder; defendant caused the two women to be tied and gagged; and Shamika, her ankles bound and her hands tied behind her back, continued to cry. The evidence tends to show Shamika was helpless and in terror; she could not plead for her life with words after being gagged, but the evidence shows she was suffering under knowledge that her death was imminent. It is difficult

to perceive how she could have imagined anything different when defendant, standing within a few feet of her, placed the muzzle of his 30-30 rifle on her forehead. Evidence that defendant shot Shamika because her crying made him nervous is evidence that he acted in a conscienceless, pitiless manner in killing her. N.C.G.S. § 15A-2000(e)(9).

**Am Jur 2d, Criminal Law § 598 et seq.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post-Gregg cases. 63 ALR4th 478.**

24. **Criminal Law § 465 (NCI4th)— first-degree murder—mitigating circumstances—emotional disturbance—low mentality—prosecutor's argument**

There was no prejudicial error in a sentencing proceeding for first-degree murder where two of the mitigating circumstances were that the capital felony was committed while defendant was under the influence of mental or emotional disturbance and that defendant had an I.Q. of 61, and the prosecutor argued that low mentality is not a defense to a criminal charge, that evidence of low mentality is irrelevant, and that the test of accountability is whether a defendant has the ability to distinguish right from wrong. The principle that low mentality is not a defense to a charge is irrelevant to sentencing; however, there was no prejudice because the jury found the statutory circumstance that the capital felony was committed while the defendant was under the influence of mental or emotional disturbance and the nonstatutory circumstance that his I.Q. was in the borderline mentally retarded range of intelligence. Although the prosecutor quoted irrelevant law, he repeatedly reminded the jury that they were being asked to consider whether the mitigating circumstances reduced defendant's culpability and the reference to irrelevant law was fleeting; defense counsel emphasized over and over that mitigation is not justification; and the court correctly instructed the jurors. N.C.G.S. § 15A-2000(f)(2).

**Am Jur 2d, Criminal Law § 598 et seq.**

STATE v. GIBBS

[335 N.C. 1 (1993)]

25. **Criminal Law § 465 (NCI4th) — first-degree murder — low mentality and emotional disturbance — prosecutor's argument — no prejudice**

There was no prejudice in a first-degree murder sentencing proceeding where the judge remained silent after the prosecutor asked, "You don't think that's the law? Ask the Judge. He'll tell you," after defendant objected to the prosecutor's argument that the test of accountability does not depend on intelligence or general mental capacity. Although defendant argued that the court implied approval of the prosecutor's argument by its silence, the jurors found the existence of the nonstatutory mitigating circumstance of borderline retardation, defense counsel was permitted to argue at length that mitigation is not justification, and the court correctly instructed the jurors on the circumstance.

**Am Jur 2d, Trial § 640.**

**Counsel's right in criminal prosecution to argue law or to read lawbooks to the jury. 67 ALR2d 245.**

26. **Criminal Law § 468 (NCI4th) — first-degree murder — sentencing — prosecutor's argument — no prejudice**

There was no prejudice in a first-degree murder sentencing proceeding where the prosecutor's argument linked defendant and a codefendant. The capital sentencing statute does not provide for an aggravating circumstance based on a defendant associating others in the capital felony, but this does not mean that no mention may be made of a codefendant actively involved at the scene of the crime. The State presented extensive evidence of the codefendant's involvement in the crimes to prove the noncapital felonies of conspiracy to commit murder and conspiracy to commit burglary; while the proper focus of sentencing is the defendant's individualized conduct, there was no prejudice in light of the jury's extensive knowledge of the codefendant's involvement.

**Am Jur 2d, Trial § 627.**

**Prejudicial effect of prosecuting attorney's argument or disclosure during trial that another defendant has been convicted or has pleaded guilty. 48 ALR2d 1016.**

**27. Criminal Law § 438 (NCI4th) — first-degree murder — mitigating circumstance of adaption to prison environment — prosecutor's argument**

A prosecutor's argument in a first-degree murder sentencing proceeding was not so grossly improper as to require intervention by the court where, in response to the nonstatutory mitigating circumstance that defendant had shown the ability to conform and adapt to the prison environment, the prosecutor told the jurors, "You watched them bring him in, bring him out. He's been under guard." The thrust of the prosecutor's argument against finding the circumstance was directed to recapitulating evidence that defendant's dangerousness in the future could not be predicted; nevertheless, the jury was entitled to consider also that while incarcerated, defendant had little opportunity to do anything other than cooperate with his jailers.

**Am Jur 2d, Trial § 614.**

**28. Criminal Law § 468 (NCI4th) — first-degree murder — aggravating circumstances — killing committed during burglary — prosecutor's argument**

There was no gross impropriety in a first-degree murder sentencing proceeding where the prosecutor argued that the jurors had found the existence of the aggravating circumstance that the murder was committed during a burglary by finding defendant guilty of first-degree burglary. N.C.G.S. § 15A-2000(e)(5).

**Am Jur 2d, Trial § 625.**

**29. Criminal Law § 468 (NCI4th) — first-degree murder — aggravating circumstance — especially heinous, atrocious, or cruel — prosecutor's argument**

There was no gross impropriety in a first-degree murder sentencing proceeding where defendant contended that the prosecutor misstated the law by arguing that evidence of premeditation and deliberation also constituted evidence that the murders were especially heinous, atrocious, or cruel, but the prosecutor did not mention premeditation and deliberation and the thrust of the argument was that the cold calculation with which defendant executed the victims tended to prove defendant's cruelty and depravity of mind and his intention

that the victims be subjected to mental suffering. N.C.G.S. § 15A-2000(e)(9).

**Am Jur 2d, Trial § 614.**

30. **Criminal Law § 455 (NCI4th)— first-degree murder— sentencing—prosecutor's argument—deterrent value of death penalty—no gross impropriety**

There was no gross impropriety in a first-degree murder sentencing proceeding from the prosecutor's argument that the jurors should recommend death because "[i]t's the only way that you can be assured that he won't do it again." The North Carolina Supreme Court has previously held that the prosecutor may argue for death because of its deterrent effect on the defendant personally, *e.g., State v. Johnson*, 298 N.C. 355, 367, 259 S.E.2d 752, 760 (1979).

**Am Jur 2d, Trial § 572.**

**Propriety, under Federal Constitution, of evidence or argument concerning deterrent effect of death penalty. 78 ALR Fed. 553.**

31. **Criminal Law § 454 (NCI4th)— first-degree murder— sentencing—prosecutor's Biblical references—no gross impropriety**

There was no gross impropriety in a first-degree murder sentencing proceeding where the prosecutor quoted from the Sixth Commandment because the comment was not outside the wide latitude permitted by *State v. Artis*, 325 N.C. 278.

**Am Jur 2d, Trial § 569.**

32. **Criminal Law § 1334 (NCI4th)— first-degree murder— sentencing—disclosure of aggravating and mitigating circumstances—not required**

The trial court did not err in a first-degree murder sentencing proceeding by denying defendant's motion for disclosure of aggravating and mitigating circumstances.

**Am Jur 2d, Criminal Law § 598 et seq.**

**33. Criminal Law § 1343 (NCI4th) — first-degree murder — aggravating circumstance — especially heinous, atrocious, or cruel — not impermissibly vague**

The aggravating circumstance that a killing was especially heinous, atrocious, or cruel is not impermissibly vague on its face or as applied.

**Am Jur 2d, Criminal Law § 598 et seq.**

**34. Criminal Law § 1327 (NCI4th) — first-degree murder — sentencing instructions — aggravating and mitigating circumstances balanced**

The trial court did not err by instructing the jurors in the penalty phase of a first-degree murder prosecution that they were to consider whether to recommend death if they found the aggravating and mitigating circumstances in equipoise.

**Am Jur 2d, Criminal Law § 598 et seq.**

**35. Homicide § 724 (NCI4th) — first-degree murder — failure to set aside burglary conviction — no error**

The trial court did not err in a first-degree murder sentencing proceeding by refusing to arrest judgment on defendant's conviction of first-degree burglary.

**Am Jur 2d, Homicide § 549 et seq.**

**36. Criminal Law § 1373 (NCI4th) — first-degree murder — death sentence — not disproportionate**

The record of a first-degree murder sentencing proceeding supports the jury's finding of aggravating circumstances, there was nothing in the record to suggest that the sentences of death were imposed under the influence of passion, prejudice, or any other arbitrary factor, and the sentences of death were not excessive or disproportionate, considering both the crimes and the defendant, where the salient characteristics of defendant's case include (i) murders of three members of a family, a mother and her children who were also defendant's mother-in-law, sister-in-law, and brother-in-law, preceded by defendant's threats, made to his wife, to harm the family; (ii) a calculated plan of attack by defendant, including efforts to disguise his identity; (iii) fear on the part of the victims, who recognized defendant and were bound and gagged; and (iv) as to the first victim, a conscienceless and pitiless shooting found to be especial-

ly heinous, atrocious, or cruel by the jury, which also found the subsequent shootings especially heinous, atrocious, or cruel.

**Am Jur 2d, Criminal Law § 628.**

37. **Criminal Law § 1135 (NCI4th)— consolidated convictions— aggravating factors—not duplicative**

The trial court did not err when sentencing defendant for first-degree burglary, conspiracy to commit burglary, and conspiracy to commit murder by finding in aggravation that defendant induced others to participate in the commission of the offense and occupied a position of leadership or dominance of other participants where there was separate evidence to support each factor. N.C.G.S. § 15A-1340.4(a)(1).

**Am Jur 2d, Criminal Law § 598 et seq.**

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing three death sentences entered by Beaty, J., at the 21 October 1991 Special Session of Superior Court, Beaufort County, on jury verdicts finding defendant guilty of three counts of first-degree murder. Execution was stayed 6 January 1992 by this Court pending defendant's appeal. Defendant having also been found guilty of one count each of first-degree burglary, conspiracy to commit first-degree murder, and conspiracy to commit first-degree burglary, the trial court consolidated these three offenses for judgment and imposed a term of imprisonment of fifty years. On 9 September 1992 this Court granted defendant's motion to bypass the Court of Appeals as to his two convictions of conspiracy and his conviction of first-degree burglary. Heard in the Supreme Court 15 March 1993.

*Michael F. Easley, Attorney General, by Joan Herre Byers, Special Deputy Attorney General, for the State.*

*James R. Parish for defendant-appellant.*

PARKER, Justice.

Defendant was tried capitally for the murders of Louise Farris and her children, Shamika Farris and William Earl Farris, Jr.; and pursuant to the jury's unanimous recommendation was sentenced to death for each of the three murders. For the reasons set out herein, we conclude the jury selection, guilt-innocence, and

STATE v. GIBBS

[335 N.C. 1 (1993)]

sentencing phases of defendant's trial were free from prejudicial error and the death sentences are not disproportionate.

State's evidence tended to show defendant was married to Ann Gibbs, whose mother and siblings were the murder victims. The families lived in Washington, North Carolina. Defendant and Ann were married 2 December 1985 but the marriage was marked by discord; Ann testified that within weeks after her marriage she discovered defendant was engaged in a relationship with Yvette Gay. Defendant later had two children by Yvette; their relationship continued up to the time defendant was arrested for the murders of Ann's family. Ann left defendant many times during their marriage and sometimes returned home to stay with her parents and siblings. Once she went to live with her mother's sister in Virginia, but defendant traced her there. In early May 1990 Ann again left defendant and went to stay in a battered women's shelter. She testified that in the past defendant had threatened to harm her family and she returned to him out of fear that he would carry out his threats. She knew defendant owned firearms and once saw two rifles in the trunk of his car. She testified defendant said they were for her if she ever left him. When she left defendant in May, she went to the shelter to protect the Farris family from defendant's harassment of herself and them.

Ann testified further that at the time of the murders she worked the midnight to 8:00 a.m. shift at National Spinning in Washington. She mostly used her father's blue 1982 Pontiac station wagon to drive to work, but on 29 May 1990 she had his red Ford Falcon. Around 11:30 p.m. she drove the Falcon to her parents' house, and her father drove her to work in the Pontiac wagon. After she had been at work about ten minutes, defendant appeared and attempted to persuade her to return to him. Ann testified she had told her supervisor she was afraid of defendant but "for some reason the guard would not keep Renwick out of the plant." Ann told defendant to go back to his new wife, Yvette. In the past when Ann had left defendant he became angry and sometimes threatened or physically assaulted her, but on this night he was calm. Her supervisor saw defendant and asked him to leave, and defendant did so.

William Earl Farris, Sr., Ann's father, testified that at the time of the murders his family lived at 1403 John Small Avenue in Washington. John Small Avenue is also North Carolina Highway

264; a short lane leads from the highway to the house. His wife, Louise, was forty years old; his daughter, Shamika, was sixteen; and his son, William Earl, Jr., was thirteen. The father worked in Greenville, North Carolina. He testified further that after taking Ann to work around midnight on 29 May, he returned home on 30 May, set his alarm clock, and went to sleep. He arose about 3:45 a.m., reset the alarm for 4:45 a.m., and dressed. Driving the Pontiac wagon, he left for Greenville. He did not return until around 1:00 p.m. on 30 May, when he saw a crowd of people at the front of the lane leading to his house.

Deborah Blount, defendant's sister, testified that she lived in Harris Acres, a trailer park in Chocowinity, where she kept defendant and Yvette's two children. Defendant lived in a trailer nearby, and around 9:30 a.m. on 30 May she saw him there. He seemed nervous and in a hurry. In the past defendant had asked her to help him persuade Ann to reconcile with him; this day he made a similar request. Defendant and Deborah drove to Washington, where she intended to do several errands. About 11:30 a.m., defendant met Deborah again at their uncle's store. Defendant laughed and joked with some other people in the store and bought an artificial rose for Ann. Defendant said he wanted Deborah to go with him to the Farrises' house to talk to Ann, and Deborah agreed to go. When they arrived at the house, Deborah knocked on the door, but no one answered, so she walked back towards defendant's car. He asked if she had looked in the window and she said she had not. Defendant went under the carport on the west side of the house, and Deborah started to follow him; but he turned back and came running past her. Screaming and pulling at his face, he ran into the front yard. Deborah was frightened and wanted to run away; but she went under the carport towards a side door and began calling out for Ann. In the house, Deborah looked down a hallway and saw a woman's pocketbook on the floor. In the hallway she turned and saw William Earl Farris, Jr., lying on the floor and another head to one side of him. Leaving the house, she ran down the lane to a florist's shop on Highway 264 and asked that authorities be called. When she returned to the house, defendant was still outside screaming and pulling at his face.

First to arrive at the crime scene were Officer David Sparrow and Detective Mary Ann Buck, both of the Washington Police Department. Sparrow testified that he noticed the window in the door under the carport was broken. In a bedroom he saw two bodies

lying face down and another leaning against a bed. Rescue squad personnel arrived and checked the bodies, and then the area was secured with yellow boundary tape. Sparrow then summoned Eric L. Tellefsen, Special Agent with the State Bureau of Investigation, and the Bureau assumed control of the investigation.

About 2:35 p.m., Special Agent Dennis G. Honeycutt, mobile crime laboratory operator, arrived at the scene. He testified at length about his observations and illustrated his testimony with photographs. All the victims' bodies were bound and gagged. The body of Shamika Farris, clad in a blue tee-shirt and white panties, was sitting on the bedroom floor, her back and head supported by the bed. A gag in her mouth was secured by a sock tied around her head, her wrists were tied behind her, and her ankles were tied together. Her skull had been split by a gunshot wound. Tissue and blood spilled out onto the floor, and a piece of her skull plate lay beside her. The body of William Earl Farris, Jr., clad only in white undershorts, was lying face down on the floor. He also was gagged, his hands were tied behind him, and his ankles were tied together. There was a round gunshot wound in his upper left back and a small hole in the floor just above his head. Louise Farris, fully clothed, was lying face down on the floor, similarly gagged and bound. By her head was a bullet hole in the bedroom floor. She had suffered a large wound in her chest and another wound in her left wrist. Honeycutt recovered four spent 30-30 shell casings from the bedroom and a piece of a brown paper bag with letters glued on to form the message, "i told you about slap-peing my Mother" [sic]. Honeycutt also observed that the drawers had been pulled out of a table in the master bedroom. In the same room the bottom drawer of a large chest had been pulled out and other drawers were open. He also saw an alarm clock set for 4:58 a.m.; the alarm had been turned off. Outside the house Honeycutt observed that some wires in the telephone junction box had been loosened and others cut.

State's evidence also included a series of statements defendant made to investigating officers. SBI Agent Kent Inscoe testified that around 5:30 p.m. on 30 May he interviewed defendant at the Washington Police Department. Defendant stated that he had last seen his wife around midnight at National Spinning. He left National Spinning and spent the night at a converted school bus where Yvette Gay lived with her twin sister Doris. On the morning of 30 May, Doris woke defendant because she needed a ride to work.

He took her to work sometime around 7:30 a.m.; went to the home of his sister, Alice; and then returned to the bus. Telling Yvette he was going back to National Spinning to see Ann, defendant left the bus again about 7:55 a.m. When he arrived at National Spinning, Ann had already left. Defendant returned to the bus, lay down for a while, and then went to his trailer in Chocowinity, where he persuaded Deborah to go to Washington with him. Later, when he and Deborah went to the Farrises' house, he went inside and called out for his wife and children. Upon seeing the bodies, he recognized Junior and Shamika, ran outside, and went into shock.

Defendant's next statement was made around 1:40 p.m. on 31 May to SBI Agent Tim Batchelor. Batchelor testified defendant stated that on 30 May he woke up around 5:00 a.m. He drove to the Farrises' house and broke in; he was wearing gloves. Louise Farris gathered her children in one bedroom, and when defendant entered the bedroom, Louise tried to grab the 30-30 rifle he was carrying, but he pushed her to the floor. Shamika began screaming. She and Louise were making a lot of noise and Louise was talking to defendant constantly. Because the women were making so much noise, defendant directed Farris, Jr., to gag them and tie them up. After this, defendant gagged and bound Farris, Jr. Shamika was screaming, and defendant shot her. Then he panicked and shot Louise and Farris, Jr. After taking Doris to work, defendant threw the rifle into the woods on a side road off River Road in Washington. He denied any knowledge of the note found in the bedroom. He said he took Deborah with him to the Farrises' house the next day because he needed a witness to verify that the family were already dead when discovered. After making this statement defendant took Agents Batchelor and Tellefsen to the place where he had discarded the rifle, and the agents recovered the rifle.

Around 8:00 p.m. on 31 May defendant made another statement to Agent Batchelor. Defendant described his relationship with Yvette and stated that Ann was aware of the relationship. He stated that he and Ann had been separated four to six times and that during the separations Ann's family refused to tell him where she was. When he telephoned the Farrises' house to speak with her, whoever answered the telephone would hang up. Defendant described his movements on the night of the murder in great detail and added that he took the rifle to keep William Farris, Sr., "off of him." Defendant had bought the rifle from a Beaufort County

STATE v. GIBBS

[335 N.C. 1 (1993)]

man who also provided a number of shells for it. When defendant broke into the Farrises' house, Louise Farris called him by name. She asked him what he wanted and he said he wanted to see Ann. Louise said Ann was not there; defendant asked where Ann was; and Louise said she would not tell him, since Ann would not even tell her mother where she was staying. Louise asked defendant what her family had done to him and whether they had ever hurt him. Defendant replied they had not. Louise told defendant she would not hurt him and did not want him to do anything crazy. Shamika started crying but Louise continued to talk over the noise. Louise asked defendant if he remembered her helping him at an earlier time, and defendant said he did. Shamika was yelling and crying louder and louder. It was at this point that defendant directed Farris, Jr., to tie up and gag his mother and sister. In spite of the gags, both women continued to talk and make a lot of noise. The noise made defendant very nervous, and he shot them to stop the noise. At first defendant said he was standing in the bedroom doorway when he shot the victims, but later he said he might have been closer to them. Defendant also said his purpose in going to the Farrises' house was to try to talk with Ann; he never intended to shoot anyone. He had never threatened to kill Ann or harm her family. He never told Ann he would kill her if she left him or hurt the people who meant most to her. Defendant again denied any knowledge of the note but said he was the only person responsible for the murders and neither of the Gay twins was involved.

On 3 June, defendant made a fourth and final statement about the murders. He admitted that Yvette Gay was with him; he told her she had better go with him or else. He had struck her once before when she did something he did not like. The two traveled in Yvette's Buick Regal automobile to the Farrises' house. Although Yvette carried a .22 caliber rifle, she did not see defendant shoot the family because he made her stand watch. In addition, Doris Gay was with him afterwards and saw him dispose of some evidence. Defendant told her to keep her mouth shut and not say anything. Defendant stated he had bought bullets for the 30-30 rifle about a month before the murders; he bought bullets for the .22 rifle about three weeks before. Before breaking into the house, he saw William Earl Farris, Sr., driving away. Defendant went to the telephone junction box and tried to cut the wires. He worked some wires loose by hand. In addition, defendant had written the note

the night before, and glue found by officers in his car had been used to make the note.

Doris Gay testified for the State pursuant to a plea arrangement. She said that two or three weeks before the murder defendant told her to go to a discount store in Greenville and buy bullets for him, and she did so. On the night of 29 May defendant went to pick Yvette up from work and the two arrived at the bus around 11:30 p.m.; but defendant left again, saying he was going to see Ann at work. He returned around 12:30 a.m. and said Ann had told him Yvette was going to be his new wife. Defendant was very angry and said he was going to kill Ann and her people. He told Doris to wake him at 3:30 a.m. Around 3:30 a.m., defendant arose and told Yvette to get up. He told Doris to get his hat and a flashlight for him and told Yvette to find a brown piece of paper with some words on it. Yvette got the paper out of the pocket of a black coat and gave it to defendant. Doris testified that two to three weeks before the murders, when she and Yvette were with defendant at his trailer in Chocowinity, they saw defendant create the note. He did this by cutting letters out of a magazine and pasting them to part of a paper bag. He asked Doris to spell some words for him. Although Doris could not remember what defendant said he planned to do with the note, he said then that he was going to kill the people. Doris testified further that defendant dressed and put on a stocking mask and blue knit cap. Yvette also wore a stocking mask and a knit cap. Defendant told Doris to get the bullets she had bought earlier and one of his guns for him, and she did so. The bullets were still in the bag in which they came from the store. Defendant took the bag and two guns with him around 4:00 a.m.,when he and Yvette left the bus, and they left in Yvette's car. Defendant and Yvette returned to the bus before light and defendant asked Doris if she smelled anything on their clothes. Doris said she smelled gun smoke. Defendant told Yvette to remove her clothes, undressed. himself, and put their clothing in a bag. Defendant and Yvette went to bed, but later Doris told defendant she needed to go to work. Although she was supposed to be at work at 6:00 a.m., defendant did not arise until between 7:00 and 7:30 a.m. Defendant dressed, got the bag of clothing and a gun, and put them in his car, a grey Chrysler Cordoba. First he drove to a service station and convenience store, where he purchased some gasoline and threw the two hats away in a trash collector. Defendant then drove along River Road, told

Doris to roll down her window, and threw out the discount store bag, which contained bullets. After driving further, defendant threw out first a black coat, then a sweater, then a bag, and then some shoes. Defendant turned the car around, retraced his route, stopped near a trailer, and threw out the 30-30 rifle. He then drove towards Washington and stopped at a pay telephone, saying he was going to call Ann. After this, defendant drove to National Spinning, looked for Ann but could not find her, and then drove Doris to work.

Dr. Page Hudson also testified for the State and was accepted by the court as an expert in forensic pathology. As to Shamika, Dr. Hudson said her ankles and wrists were bound with knotted socks and she had sustained a massive gunshot wound to the head. Tearing around the wound indicated it was a contact wound, that is, that the muzzle was in contact with her hair and scalp when the gun was fired. A piece of her skull plate was lying on the floor, and this was also characteristic of a contact wound. She was incapacitated and dead almost instantly after being shot. As to Louise, Dr. Hudson observed a contact wound to her upper chest, an exit wound in her upper left back, and a separate wound on her left wrist. She was shot either sitting or standing, the contact chest wound caused her death, and she was incapacitated quickly and unconscious within a minute and dead soon after. As to Farris, Jr., gunshot residue stippling on his back indicated the gun muzzle was at most three feet away; and due to a high spinal cord injury, he lived at most only minutes after being shot.

At the close of State's evidence defendant moved to dismiss all the charges against him; the trial court denied the motion. Defendant did not present evidence in the guilt-innocence phase. The jurors found defendant guilty on all counts as charged. On the three murder charges the jury found defendant guilty on the theories of both premeditation and deliberation and felony murder.

In the sentencing phase the State did not present additional evidence. Defendant's evidence included the testimony of several jail ministers, who said that while in jail awaiting trial defendant repented and turned to God and was sincere in his religious beliefs. Several of defendant's family members testified about difficulties he encountered while growing up, including poverty, a broken home, the death of his mother, inability to perform well in school, emotional instability, and bouts of depression.

STATE v. GIBBS

[335 N.C. 1 (1993)]

Defense witness Brad Fisher was accepted by the court as an expert in clinical psychology. He interviewed defendant on 16 and 17 January 1991 and 24 October 1991 and also reviewed defendant's school, medical, and mental health records. Fisher opined that defendant suffered from borderline mental retardation and personality disorder. The retardation, however, was a small component of defendant's overall personality dynamic, his major disability being personality disorder. Defendant's personality disorder caused him to be (i) unable to cope with stress and (ii) aggressive towards others. Fisher opined further that defendant would probably do well in the structured environment of prison. On cross-examination Fisher said that repeated threats by defendant to kill his wife and her family would be consistent with Fisher's evaluation of him. Defendant's conduct in preparing the note, engaging Doris to buy bullets, and taking his sister with him to discover the bodies showed ability both to think and to think ahead. In addition, despite his retarded level of cognitive ability, defendant knew the difference between right and wrong.

As to each murder charge, three aggravating circumstances were submitted to the jury: First, the murder was committed while defendant was engaged in committing a burglary. N.C.G.S. § 15A-2000(e)(5) (1988). Next, the murder was especially heinous, atrocious, or cruel. N.C.G.S. § 15A-2000(e)(9). Last, the murder was part of a course of conduct which included defendant's commission of crimes of violence against another person or persons. N.C.G.S. § 15A-2000(e)(11). The jury found the existence of all three circumstances as to each murder.

Four statutory mitigating circumstances were submitted: First, the murder was committed while the defendant was under the influence of mental or emotional disturbance. N.C.G.S. § 15A-2000(f)(2) (1988). Second, defendant's capacity to appreciate the criminality of his conduct or conform it to the requirements of law was impaired. N.C.G.S. § 15A-2000(f)(6). Third, the age of the defendant at the time of the crime. N.C.G.S. § 15A-2000(f)(7). Last, any other circumstance arising from the evidence which the jury deemed to have mitigating value. N.C.G.S. § 15A-2000(f)(9). The jury found the existence of only three circumstances, (f)(2), (f)(7), and (f)(9), specifying as to the last that defendant during his formative years did not receive help sufficient to overcome his mental inadequacies.

STATE v. GIBBS

[335 N.C. 1 (1993)]

Sixteen nonstatutory mitigating circumstances were also submitted. Of these, the jury found three: Defendant had "an I.Q. of 61, which is in the borderline mentally retarded range of intelligence"; he lacked "education"; and while in jail he professed Christian faith and "accepted Christ as his Lord and Savior."

Pursuant to N.C.G.S. § 15A-2000(b)(2), the jury unanimously found beyond a reasonable doubt that the mitigating circumstances found were insufficient to outweigh the aggravating circumstances found. Further, considered with the mitigating circumstances, the aggravating circumstances were sufficiently substantial to call for imposition of the death penalty. See N.C.G.S. § 15A-2000(b)(3). Consequently, their recommendation was that defendant be sentenced to death.

JURY SELECTION ISSUES

[1] Defendant first contends the trial court erred in failing to (i) inquire of two prospective jurors if they had seen defendant in handcuffs and (ii) caution them to disregard the handcuffs. We disagree with this contention.

During jury selection, in the presence of prospective jurors Truslow and Hobbs, the court asked prospective juror Sykes whether he accepted the principle that defendant was presumed innocent. The following exchange then took place:

THE COURT: You understand that it is a two-stage proceeding to the extent that first you will be concerned with whether or not the defendant is guilty or innocent of first degree murder. You understand that?

A. Yeah, but over the course of—well, I've been here three days. Seen him come and go and he has the handcuffs on. Well, if he was innocent until proven guilty, handcuffs wouldn't be on him. . . .

. . . .

THE COURT: You understand that there has been no evidence presented at this point and under our law the [S]tate has the burden of proving guilt beyond a reasonable doubt. And at this point under the law the defendant is presumed to be innocent. Do you understand that?

A. I understand that law, what you are saying about the law, but I—but then I see him. And when I see that he comes

in with handcuffs on, obviously I feel like he needs the hand-cuffs on.

THE COURT: I'll excuse you for cause.

Defendant argues before this Court that after Sykes indicated he saw the handcuffs and this caused him to believe defendant was dangerous, needed the handcuffs, and, therefore, was guilty, the court on its own motion should have instructed Truslow and Hobbs so as to correct any similar misconceptions on their part. Defendant argues further that the court's failure to give any remedial, curative, or cautionary instruction to these other prospective jurors resulted in prejudicial error because the judge's inaction implied concurrence with Sykes' opinion. We do not find these arguments persuasive.

In capital cases, trial judges are vested with discretion to regulate and supervise jury selection. *State v. McDowell*, 329 N.C. 363, 379, 407 S.E.2d 200, 209 (1991) (stating basis for discretion is judge's opportunity to see and hear jurors and observe their demeanor on *voir dire* and judge may excuse a juror although neither party has offered a challenge).

This Court has previously addressed "whether a mistrial is required because jurors had an opportunity to see an accused in handcuffs while being escorted from the jail to the courthouse." *State v. Montgomery*, 291 N.C. 235, 250, 229 S.E.2d 904, 913 (1976). Where some jurors momentarily view a defendant in handcuffs being escorted from a separate jail building to the courthouse, a trial judge does not err in denying a motion for mistrial. *Id.* at 252, 229 S.E.2d at 914.

In an analogous case, *State v. Corbett*, 309 N.C. 382, 307 S.E.2d 139 (1983), a venireman stated he had been following the case in the newspapers and had formed the opinion that defendant was guilty. Defendant's motion for a mistrial was denied. Although defendant's subsequent motion to excuse this prospective juror for cause was denied, he was eventually excused for cause on other grounds. On appeal defendant argued that the prospective juror's remark that he believed defendant guilty so prejudiced defendant's defense that he could not receive a fair trial from the jury eventually impanelled. This Court disagreed, stating as follows:

> Defendant assumes that the remark of one prospective juror before jury selection was completed so infected the ability

of the remaining prospective jurors to exercise their own judgment that a mistrial ought to have been granted.

"[T]he right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722, 6 L. Ed. 2d 751, 755 (1961). Generally, a juror who has formed an opinion as to defendant's guilt or innocence is not impartial and ought not serve. N.C. Gen. Stat. § 15A-1212(6) (1978). The defendant must prove the existence of an opinion in the mind of a juror that will raise a presumption of partiality. *Murphy v. Florida*, 421 U.S. 794, 800, 44 L. Ed. 2d 589, 595 (1975).

> . . . To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. . . .

*Irvin v. Dowd, supra*, 366 U.S. at 722-23, 6 L. Ed. 2d at 756.

> Defendant has failed to establish that the mere fact that one prospective juror who was later excused for cause stated that in his opinion defendant was guilty caused the remaining prospective jurors to become unable to render a verdict based on the evidence presented in court. Defendant has presented no evidence that [the prospective juror's] opinion carried *any* weight with the jurors selected.

*Corbett*, 309 N.C. at 386-87, 307 S.E.2d at 143.

Thus under *Corbett*, even when a defendant moves for mistrial, the court is not required to caution other prospective jurors if one has expressed an inability to follow the presumption of innocence based on news reports. In the instant case, defendant did not request curative instructions or move for a mistrial but merely excepted to the court's excusing Sykes.

After the exchange with Sykes, the court excused him, thereby repelling any inference that the court concurred with his opinion that defendant was guilty. Afterward the court addressed Truslow and Hobbs as follows:

> As I said to the other two jurors, to the extent the matter has been addressed, do you feel that you have any opinion at this point that would affect your ability to sit on this case

and render a fair and impartial trial [sic] considering that this is a case for which the defendant could receive or could be exposed to the penalty of death or life?

Hobbs first answered that she had seen defendant on television and had no conscious memory of what was said about the case but did not know what might be in her subconscious. Asked if she could not sit on the jury and render a fair and impartial verdict, she answered that she was willing to listen to the evidence. She also said she had not made up her mind as to what the outcome should be as to either guilt or punishment. Under these circumstances, we hold the trial judge did not err by failing to give remedial, curative, or cautionary instructions on his own motion after excusing Sykes.

[2]  Defendant's second contention is that the court failed to give curative instructions in another, similar situation during jury selection. Again, we do not agree.

Responding to the court's asking the members of the venire whether they had heard or read anything about the case, Hicks said, "On TV." Asked whether he had formed an opinion about defendant's guilt or innocence, Hicks answered, "Guilty, I feel right now, the way I feel." Asked to state only whether he had formed an opinion, Hicks said he had, and the court excused him.

Again defendant argues the trial court erred by failing to give a cautionary instruction to the rest of the venire, thereby implying concurrence with Hicks' opinion. Defendant, however, did not request any instruction, and the court's excusing Hicks repelled any inference of concurrence with his opinion. We conclude, therefore, that the court did not err in failing to give an instruction.

[3]  Defendant next contends the court erred in excusing on its own motion and for cause prospective juror Dawson, who stated she had formed an opinion as to the innocence or guilt of the defendant. Defendant argues this was error under *Irvin v. Dowd*, 366 U.S. 717, 6 L. Ed. 2d 751 (1961), and that in failing to determine whether the juror could lay aside her opinion and render a verdict based on the evidence, the court failed to exercise its discretion. We disagree.

The determination by the trial court that the prospective juror could not be impartial was based on the statement of the prospective juror that she had formed an opinion about the case. This

statement supported the finding. Therefore, the court did not err in excusing Dawson. *State v. McDowell*, 329 N.C. 363, 407 S.E.2d 200 (1991).

[4] Defendant next contends the trial court erred in granting State's motions to excuse for cause three jurors whose opposition to the death penalty would not have substantially impaired their ability to be fair and impartial. Again we disagree.

> The standard for determining whether a prospective juror may be properly excused for cause for his views on capital punishment is whether those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985); *accord, State v. Davis*, 325 N.C. 607, 621-22, 386 S.E.2d 418, 425 (1989), *cert. denied*, 496 U.S. 905, 110 L. Ed. 2d 268 (1990).

*State v. Syriani*, 333 N.C. 350, 369-70, 428 S.E.2d 118, 128, *cert. denied*, --- U.S. ---, 126 L.Ed.2d 341 (1993); *see also State v. Brogden*, 334 N.C. 39, 42, 430 S.E.2d 905, 907 (1993) (reiterating *Witt* standard). Where a person's responses reveal he does not believe in the death penalty and that his belief would interfere with the performance of his duty at the guilt-innocence or sentencing phase, these responses demonstrate that he cannot fulfill the obligations of a juror's oath to follow the law in carrying out his duties as a juror; and the trial court does not err in excusing him for cause. *Syriani*, 333 N.C. at 371, 428 S.E.2d at 129. Jurors must be able to " '*state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.*' " *Brogden*, 334 N.C. at 43, 430 S.E.2d at 907-908 (alteration in original) (quoting *Lockhart v. McCree*, 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149 (1986) ).

In the instant case, the record shows that prospective juror Barbara Malpass first said the capital nature of the case would not affect her ability to sit on the jury. Immediately after this, however, she said, "I don't think I would vote death penalty, if there was any other choice." Although she next indicated to the court that she had not made up her mind that the penalty should be death or life, when asked by the prosecutor if she could vote to impose the death penalty upon defendant's conviction, she said, "I don't think so" and "I don't think I would. I don't know. Like I say I don't know until I hear the case." The following exchange then took place:

Q. You have indicated that you do not think that you could do that.

A. Right.

Q. And would that be so no matter what the evidence might show, Ms. Malpass, that you could not under any circumstances vote to impose a sentence of death on Renwick Gibbs or anybody else; is that what you are saying to me?

A. That I could not vote? I did not say that I could not vote. I said I would rather not do it. I prefer not to sentence a person to death, if I have another choice, no matter what he did.

. . . .

Q. . . . . [I]f satisfied from the evidence and beyond a reasonable doubt pursuant to the law as the judge explains it to you, could you and would you in that instance vote—

A. Well, to answer your question now before the trial, the best I can answer you is no I would not.

Q. So you are at this time are [sic] committed to—automatically committed at this time not to impose a sentence of death?

A. Yes, sir.

Q. And is that so no matter what the evidence might be or what the law is?

A. No, I didn't say that.

. . . .

Q. Are you saying that there are no circumstances under which you could impose a sentence of death on Mr. Gibbs or anyone else for that matter?

A. I think I'm saying that, yes.

Q. Under no set of circumstances?

A. I don't think I could.

After these exchanges, Malpass indicated that to the contrary, she would not vote for the "death penalty without going through the trial or whatever, without knowing the circumstances or anything about it," and her decision to "give the death penalty would be

**STATE v. GIBBS**

*[335 N.C. 1 (1993)]*

based on the evidence we get, and the crime, and the situation." Nevertheless, upon further questioning by the State, Malpass said, "[L]ife is precious and I would not want to, if I had any other choice, to vote death penalty for someone." Asked if she would always choose to vote for a life sentence, she answered, "Normally I would. I would say yes." Asked if she could "say to Renwick Gibbs that he should be put to death," she answered, "No. . . . I could decide if I felt he was guilty or not, but I don't think I would vote to put him to death, no."

Malpass's responses indicated she opposed the death penalty and her view would interfere with the performance of her duties as a juror in the sentencing phase. Pursuant to *Witt*, we conclude the court did not err in granting the State's for-cause challenge and excusing her.

[5] Venireman Nelson Simpson, a Pentecostal minister, said that according to his religious beliefs, imposing the death penalty "would put me in a very bad situation. I would not like to have that imposed on me to try to have to make that kind of a decision." If called upon to vote for the death penalty, he "wouldn't like to, no sir." Later he said,

> Let me put it this way, I mean the way that I feel, the way that I see the things as they are. I know you have to have laws. I believe in these. We have to have man-made laws as well as God's laws. But if it was left up to me, personally, there wouldn't be any death penalty. Maybe life, but no death penalty, if it was personally left up to me.

Following this statement the court questioned him as follows:

> THE COURT: Are you saying that you could consider the penalty of death and the penalty of life based upon the circumstances of any particular case?

> A. No, not really, I just think life is precious and I would not want to feel like that I had anything to do with someone else's losing theirs.

> THE COURT: Are you saying at this time that you would automatically vote against the imposition of the death penalty, if you were called upon to do that based upon the law and the evidence in the case?

STATE v. GIBBS

[335 N.C. 1 (1993)]

A. In this case, probably I would, yes, sir. Because I've tried to explain my situation and I believe I would not—it doesn't mean that I wouldn't listen, doesn't mean that I wouldn't try to be fair. But I would just hate to know that under the circumstances that he could very well get death because of a vote that I made.

THE COURT: You are indicating then that opinion or having that opinion would affect your ability to sit on this case and render a fair and impartial verdict for the State and for the defendant?

A. If that is the way it has to be worded, yes, sir.

. . . .

THE COURT: Again, you are saying upon final analysis if called upon to answer that question and to make a recommendation as to life or death, you would automatically vote for the imposition of life?

A. Right, I would have to go against death, yes sir.

Simpson's bias against the death penalty was shown with unmistakable clarity. Under these circumstances Simpson could not affirm that he would follow the law in carrying out his duties during sentencing. Therefore, we conclude the court did not err in granting the State's motion to challenge him for cause and excusing him.

[6] Prospective juror Rita Barrow responded to the State's questions on *voir dire* as follows:

Q. Having those things in mind, Ms. Barrow, how do you feel about the death penalty?

A. I don't believe in it.

THE COURT: Speak up, please.

A. I don't believe in the death penalty.

Q. I take it then that you are opposed to the death penalty?

A. Yes.

Q. Certainly there are people all across the state that have different views about it. Some are for the death penalty. Some

are opposed to the death penalty. There is nothing at all wrong with that.

A. I'm opposed to it. I'm still opposed to it.

Q. Is this some religious, or moral, or personal belief that you have had, Ms. Barrow?

A. My religion.

. . . .

Q. I take it this is something, some belief, that you have held for a long time?

A. Yes.

Q. Is it true that you could not and would not ever vote to impose a sentence of death; is that correct?

A. Yes.

. . . .

Q. And would that be so no matter what the evidence or what the law is?

A. Well, yes, well, in a way I'd rather just give him life imprisonment.

Q. You would automatically vote for a sentence of life imprisonment no matter what the law was and no matter what the evidence was; is that correct?

. . . .

A. Yes.

Q. You could not under any circumstances vote to impose a sentence of death; is that correct?

A. No, I couldn't.

Based on these responses, the State moved to challenge for cause, and the court began to question Barrow. At first her answers accorded with those quoted above; but when the court asked whether her opinion about the death penalty would substantially impair her ability to render a fair and impartial verdict, she answered, "No." The court continued to question as follows:

THE COURT: The question is whether or not you feel that your opinion about the death penalty would impair, that is, adversely affect your ability to sit on this case and render a fair and impartial trail [sic] both as to guilt or innocence and as to the penalty stage?

A. No.

THE COURT: Could you then consider both life and death as possible punishments if there is a return of a verdict of first degree murder?

A. I don't know.

THE COURT: Are you indicating then that you could consider the possible punishments that may be established by the law based upon the evidence that may be presented?

A. I would have to hear the evidence first and then decide.

THE COURT: So is your mind made up at this point as to punishment?

A. Yes.

THE COURT: Are you indicating that you would automatically vote against the imposition of the death penalty, if you were called upon to do that?

A. Yes.

THE COURT: You answered earlier that you could consider life or death. I'll let you explain that to me, whether or not that is your opinion or you feel that you could not consider—

A. To tell you the truth, I really don't know. I couldn't suggest that—make up my mind, really. I might could. I might could.

Some of Barrow's responses were equivocal. Although she stated she was opposed to the death penalty and would automatically vote against imposition of it, she vacillated when asked if she could consider life or death. The answers of this prospective juror demonstrated that her views on capital punishment would have substantially impaired her ability to perform her duties as a juror in accordance with her oath. We conclude, therefore, that based on the venireperson's responses as set out above, the trial court

did not err in granting the State's motion and excusing Barrow for cause.

[7] Defendant next contends the court erred in denying him an opportunity to rehabilitate prospective jurors Moore and Boston after the State moved to excuse them for cause based on their answers to death qualification questions. Again we disagree.

In *Brogden* this Court found error where the record clearly showed (i) repeated denials by the trial court of requests to rehabilitate under the mistaken belief that such requests are to be denied as a matter of law and (ii) excusal by the trial court of a prospective juror likely qualified to be seated. *Brogden*, 334 N.C. at 53, 430 S.E.2d at 913. By contrast, where the record shows the challenge is supported by the prospective juror's answers to the prosecutor's and court's questions, absent a showing that further questioning would have elicited different answers, the court does not err by refusing to permit the defendant to propound questions about the same matter. *State v. Hill*, 331 N.C. 387, 403, 417 S.E.2d 765, 772 (1992). In addition, "[t]he defendant is not allowed to rehabilitate a juror who has expressed unequivocal opposition to the death penalty in response to questions propounded by the prosecutor and the trial court." *State v. Cummings*, 326 N.C. 298, 307, 389 S.E.2d 66, 71 (1990). Finally, in determining whether the trial court erred in denying a request to rehabilitate, this Court considers the entire *voir dire* of the prospective juror. *Brogden*, 334 N.C. at 46, 430 S.E.2d at 909.

With these principles in mind, we turn to the *voir dire* of prospective jurors Moore and Boston. Moore told the prosecutor that because of her religious beliefs she could not pass judgment on another person. She would have to abstain from voting "because the Lord said vengeance is His and I wouldn't be fair because of that." In response to questioning by the court Moore stated she could base her opinion on the evidence, "but to make a decision where he would be [sic] life, no." Her religious beliefs would prevent her from determining punishment. Only after she stated that based on her religion, she could not participate in the proceeding, did the court grant State's motion to challenge for cause. The following exchange then took place out of the presence of the venire:

THE COURT: I'll hear from you, Mr. Paul.

MR. PAUL: Thank you, your honor. Your honor, at this time the defendant would move to be able to voir dire the challenge of juror Ms. Carrie Brock Moore and the court has just sustained a motion for cause by the State. I would like to say that we understand at this point in time the law in North Carolina is as expounded by the Supreme Court in this state indicates there is no right as such to a voir dire or to rehabilitate a jury challenge for cause. As to the issue of the death qualification we submit that. We also know that the laws in the court cases, appellate cases have a way of changing and we would like to [p]reserve that for the record. We make that request.

THE COURT: I'll note that you have made that request and I'll add to the record the court inquired rather extensively of Ms. Moore as to her opinions. And Ms. Moore's opinions based upon the court's finding would substantially impair her ability to sit on this case and render a fair and impartial trial [sic].

In our view this exchange shows the trial court did not err in denying defendant's request to rehabilitate Moore. Defendant does not argue, and the record does not show, that the court made a blanket refusal to permit rehabilitation of any jurors. More importantly, defendant made no showing in the trial court and does not show this Court how further questioning would have elicited different answers from Moore. Under these circumstances, we conclude the court did not err.

In answering questions from the prosecutor, prospective juror Boston said he did not believe in the death penalty, would never vote to impose a death sentence, and would automatically vote against the death penalty. Responding to questions by the court, Boston twice repeated that he would automatically vote against the death penalty. The court excused him for cause, noting an exception for defendant. Boston's unequivocal answers compel the conclusion that further questioning would not have elicited different answers. Therefore, we conclude the court did not err in granting State's challenge for cause without permitting defendant to attempt to rehabilitate Boston.

[8] Defendant's next contention is that the court erred in instructing the venire during *voir dire* on accomplice testimony. During jury selection, the prosecutor asked several questions related to accomplice testimony. The court on its own motion instructed as follows:

Members of the jury, you are all aware as the State has indicated that there may be what is called accomplice testimony. The [c]ourt would instruct you that at the proper time that you may consider that, but you are to scrutinize that testimony as you would any other statement in determining what credibility to give to that particular testimony if it is offered and what weight you would put to that considering all the evidence during the course of the trial.

The State would acknowledge to you that there is accomplice testimony, but it would be up to you, as you [sic] have indicated, to determine what credibility to place on that witness and what weight to place on the testimony in light of all the circumstances.

Defendant concedes he failed to object but argues this Court can consider the error under Appellate Rule 10, which provides as follows:

In criminal cases, a question which was not preserved by objection noted at trial and which is not deemed preserved by rule or law without any such action, nevertheless may be made the basis of an assignment of error where the judicial action questioned is specifically and distinctly contended to amount to plain error.

N.C. R. App. P. 10(c)(4). Defendant argues that the court erred because it equated the interest of an accomplice with that of any other witness, but the standard for evaluating accomplice testimony is more stringent. *State v. Bailey*, 254 N.C. 380, 385, 119 S.E.2d 165, 169 (1961). We agree that the instruction given did not set forth the proper standard of evaluation; we disagree that this error constitutes plain error.

Plain error is " '*fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done.' " *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir. 1982) ). Discussing the overall charge to the jury, this Court said in *Odom* that "[i]n deciding whether a defect in the jury instruction constitutes 'plain error,' the appellate court must examine the entire record and determine if the instructional error had a probable impact on the jury's finding of guilt." 307 N.C. at 661, 300 S.E.2d at 378-79.

STATE v. GIBBS

[335 N.C. 1 (1993)]

In this case, in addition to the instruction during *voir dire*, immediately before Doris Gay testified for the State the court instructed the jury on how to consider testimony pursuant to a plea arrangement. Also, in charging the jurors prior to their deliberations on guilt, the court instructed correctly on how to consider accomplice testimony and again on how to consider testimony pursuant to a plea arrangement. Defendant does not contend the court erred in any of these instructions. "[E]ven when the 'plain error' rule is applied, '[i]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.' *Henderson v. Kibbe*, 431 U.S. 145, 154, 52 L. Ed. 2d 203, 212, 97 S. Ct. 1730, 1736 (1977)." *Id.* at 660-61, 300 S.E.2d at 378. Viewing the entire record, including the correct instructions given during the guilt-innocence phase, we conclude defendant has failed to show plain error arising from the court's preliminary instruction on accomplice testimony.

[9] Defendant next contends the trial court erred by failing to prevent the prosecutor from using language suggesting that in all likelihood the penalty phase would be reached. Citing *State v. Smith*, 279 N.C. 163, 181 S.E.2d 458 (1971), a case involving jury argument, defendant argues the language was improper and the implication impermissibly prejudiced him. We do not agree.

At four different times the prosecutor prefaced questions with, "[I]f and when we pass that first stage and move into what is known as the second stage or the penalty phase of the trial." In addition, "If and when the defendant is found guilty of murder in the first degree, we would then move into what is known as the second phase or the penalty phase of the trial" or similar language was used nine times. Defendant did not object to any of the prefatory language.

Although occurring in jury selection, the prosecutor's comment defendant now challenges can be analogized to comments by a prosecutor during jury argument. This Court has held that in capital cases, control of jury arguments is within the discretion of the trial court, whose determination will not be reversed "unless the impropriety of counsel's remarks is extreme and is clearly calculated to prejudice the jury in its deliberations." *State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979). In addition, "counsel may not place before the jury incompetent and prejudicial matters by injecting his own knowledge, beliefs and personal opinions not

supported by the evidence." *Id.* at 368, 259 S.E.2d at 761. Where defendant makes no objection in the trial court, gross impropriety is the standard governing appellate review of the prosecutor's jury argument in a capital case. *E.g., State v. Kirkley*, 308 N.C. 196, 302 S.E.2d 144 (1983), *overruled on other grounds by State v. Shank*, 322 N.C. 243, 367 S.E.2d 639 (1988); *Johnson*, 298 N.C. 355, 259 S.E.2d 752.

In *State v. Zuniga*, 320 N.C. 233, 357 S.E.2d 898, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987), this Court reviewed language used by the State during jury selection. The prosecutor asked whether "if the juror found that any aggravating factors outweighed any mitigating factors, he or she would be able to recommend death 'for what [defendant] did to this little girl.' " *Id.* at 250, 357 S.E.2d at 910 (alteration in original). On appeal defendant argued that the question (i) suggested the issue of guilt had already been decided against him and (ii) was so grossly improper as to require the court's ex mero motu intervention. *Id.* This Court held there was no gross impropriety. *Id.*

In the instant case defendant argues the prefatory language constituted a comment that there was a good possibility the defendant would be found guilty. However, the prosecutor never stated that in defendant's trial the sentencing phase was certain to be reached. In addition, defense counsel elicited from most seated jurors an understanding that the second, or penalty phase, would not necessarily be reached. The court repeatedly instructed the venire and the jury that only if defendant was convicted would there be a separate sentencing proceeding. A fair reading of the prosecutor's statements shows that like those of the court, they simply refer to the conditional nature of bifurcated capital prosecutions mandated by N.C.G.S. § 15A-2000: Only if the defendant is found guilty in the guilt-innocence phase will a penalty phase be reached. Nothing in the statements themselves suggests the prosecutor was attempting to place before the venire prejudicial matters by injecting his own beliefs or personal opinions unsupported by evidence. Moreover, after reviewing the entire *voir dire*, we are satisfied that the repetitions did not constitute such an attempt. Therefore, we conclude there was no gross impropriety.

[10] Finally, defendant contends the trial court erred during jury selection by twice overruling his objection to the prosecutor's language, which allegedly implied that the jurors could not be

fair to their country and state and also be fair to the defendant. Again we disagree.

Even if the remarks complained of gave rise to such an implication, defendant has failed to show either abuse of discretion or prejudice arising therefrom. *E.g., Johnson,* 298 N.C. at 369, 259 S.E.2d at 761. Therefore, we conclude the trial court did not err.

GUILT-INNOCENCE PHASE ISSUES

[11] Defendant first contends the court erred in permitting the prosecutor in his opening statement to imply twice that the jurors could not be fair to both the defendant and the State. Defendant's objections were overruled by the court. Defendant argues that the prosecutor's attempt to sow the seed in the jurors' minds that they could not be fair to both parties "improperly prejudiced the defendant." We do not find this argument persuasive.

Control of the parties' opening statements is within the discretion of the trial court. *E.g., State v. Thacker,* 301 N.C. 348, 357, 271 S.E.2d 252, 257-58 (1980); *see also State v. Benson,* 323 N.C. 318, 325, 372 S.E.2d 517, 520 (1988) (reviewing for gross impropriety where defendant failed to object). We have carefully reviewed the record and conclude that the court's overruling of defendant's objections did not constitute abuse of discretion and that the court did not err.

[12] Defendant next contends that by denying his motion to suppress statements made by him on 31 May and 3 June, the trial court committed constitutional error. Again we disagree.

Suppression hearing testimony showed that defendant agreed to undergo a polygraph examination and on the morning of 31 May 1990 went with .Agent Tellefsen and Detective Skinner to Greenville, North Carolina, to be tested. Within minutes of having completed the test, defendant made a confession to Agent Davenport, the polygraph operator. Shortly after this, defendant made to Agents Tellefsen and Batchelor the confession described hereinabove and assisted them in recovering the 30-30 rifle.

After recovery of the rifle, defendant returned with the officers to the police department in Washington, where, beginning about 3:45 p.m., he sat in an interview room with Agent Batchelor. Hair samples and fingerprints were taken, and at 6:32 p.m. Batchelor told defendant he was going to be charged with the murders. While

**STATE v. GIBBS**

[335 N.C. 1 (1993)]

sitting in the interview room with Batchelor, defendant was not questioned. Batchelor testified, "There was conversation, but not related to this crime. Simply an awkward situation trying to make small talk with Mr. Gibbs basically." From time to time other agents went in and out of the interview room. Defendant was permitted to use the toilet and provided with a soft drink upon his request. Soon after 6:32 p.m. he was taken to the magistrate's office, where arrest warrants were served on him, and then returned to the police department. On cross-examination Batchelor testified that about fifteen minutes before defendant was taken to the magistrate's office, he asked if he had to get an attorney. This inquiry was the first time defendant had mentioned an attorney in Batchelor's presence. Batchelor told defendant the question of a lawyer had to be his decision and asked defendant if he could afford to hire an attorney. Defendant said he could not, and Batchelor told him the court would appoint an attorney to represent him if he asked for one. During *voir dire* cross-examination, the court questioned Batchelor as follows:

THE COURT: . . . [L]et me just ask you, you indicated at around 6:15, when you had conversation with the defendant about an attorney, are you stating that you were advising him of his rights at that time or he was just asking about an attorney?

A. No, sir, during a period of time where there was not any activity going on between Mr. Gibbs and I [sic] — we were simply sitting in an interview room — Mr. Gibbs asked me if you had to get an attorney and I advised him that that was a decision that he had to make. I was not involved in any questioning or answering and didn't intend at that point in time to interview him. So I did not advise him of his rights and didn't intend to at that point in time, because there was going to be no questioning.

On redirect-examination, Batchelor testified that defendant's remark about an attorney was not made in response to a question from Batchelor. At 8:12 on the same evening, Agent Batchelor and Detective Sergeant John Taylor of the Washington Police Department interviewed defendant. Batchelor testified that he read defendant the *Miranda* rights, and defendant signed a waiver of rights form. Further, during the interview defendant's words at times "were mis-spoken or slurred over, but he was clearly understandable in

his speech. His speech was not perfect English, but he was clearly understandable and able to convey his meaning quite clearly."

Also on *voir dire* Agent Tellefsen testified as to facts and circumstances surrounding defendant's fourth and final statement, made on 3 June. Sometime before 4:00 p.m. on that day, defendant asked someone at the Washington jail to call Agent Batchelor, who had left his business card with defendant, and summon him to the jail to talk with defendant. Agent Batchelor was not available, Tellefsen received the message, and Tellefsen and Officer Taylor went to the jail. They told defendant they were responding to his call and took him to the sheriff's office. Defendant said he wanted to talk to them. They read defendant the *Miranda* rights; he said he understood and signed the waiver form. Defendant then made the detailed confession described hereinabove.

Before this Court defendant contends his right to counsel under the Fifth and Sixth Amendments to the United States Constitution and Article I, §§ 19 and 23, of the North Carolina Constitution was violated by the interview conducted by Batchelor and Taylor on the evening of 31 May and the interview conducted by Tellefsen and Taylor on 3 June. We do not agree with this contention.

Defendant's motion to suppress stated that his statements "were obtained in violation of Defendant's right to counsel prior to and during interrogation." Defendant did not cite the Sixth Amendment or the North Carolina Constitution but merely urged that his statements were inadmissible because officers failed to advise him of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966). In arguing in support of the motion, defense counsel did not mention the Sixth Amendment or the North Carolina Constitution.

This Court has said that constitutional questions " 'not raised and passed upon in the trial court will not ordinarily be considered on appeal . . . [and] when there is . . . a motion to suppress a confession, counsel must specifically state to the court before voir dire evidence is received the basis for his motion to suppress . . . .' " *State v. Benson*, 323 N.C. 318, 322, 372 S.E.2d 517, 519 (1988) (quoting *State v. Hunter*, 305 N.C. 106, 112, 286 S.E.2d 535, 539 (1982) ). Under *Benson*, since defendant did not cite the Sixth Amendment in his motion or arguments to the trial court, he may not properly present an argument based thereon in this Court.

Nevertheless, this Court employs utmost diligence and care in reviewing capital cases. *State v. Pinch*, 306 N.C. 1, 37, 292 S.E.2d 203, 229, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *overruled on other grounds by State v. Wilson*, 322 N.C. 117, 367 S.E.2d 589 (1988), *and overruled on other grounds by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Smith*, 305 N.C. 691, 711, 292 S.E.2d 264, 276, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982). Therefore, we elect to consider defendant's arguments based on the Sixth Amendment. We conclude that since his Sixth Amendment rights were not abridged, there was no error in the denial of his motion to suppress.

"The initiation of judicial proceedings . . . marks the commencement of the 'criminal prosecutions' to which alone the explicit guarantees of the Sixth Amendment are applicable." *Kirby v. Illinois*, 406 U.S. 682, 689-90, 32 L. Ed. 2d 411, 417-18 (1972). In accord with this principle this Court has said that the right to counsel

attaches and applies at and after any pretrial proceeding that is determined to constitute a critical stage in the proceedings against the defendant.

. . . A preliminary hearing, though not in itself constitutionally required, is, when given, a critical stage requiring the assistance of counsel or a valid waiver of that right.

. . . Once a critical stage has been reached . . . the police may not question a defendant, absent a valid waiver, without the presence and assistance of counsel . . . .

. . . .

. . . [T]he [first] appearance [pursuant to N.C.G.S. § 15A-601] before a district court judge is not a critical stage because it is not an adversarial judicial proceeding where rights and defenses are preserved or lost or a plea taken.

*State v. Detter*, 298 N.C. 604, 619-24, 260 S.E.2d 567, 579-82 (1979) (citations omitted); *accord State v. Nations*, 319 N.C. 318, 323-24, 354 S.E.2d 510, 514 (1987).

Following these principles, we reject defendant's argument that a Sixth Amendment right to counsel arose when he was arrested.

Defendant also argues, however, that under N.C.G.S. § 15A-601, he was entitled to a first appearance on 1 June. Further, he did

not make his first appearance within the period provided by that statute, and a Sixth Amendment right to counsel arose on 1 June, when he was entitled to a first appearance. We reject this argument.

Section 15A-601 provides that any defendant charged in criminal process with a crime in the original jurisdiction of the superior court must make a first appearance before a district court judge. Unless the defendant is released on bail, this first appearance "must be held within 96 hours after the defendant is taken into custody or at the first regular session of the district court in the county, whichever occurs first." N.C.G.S. § 15A-601(c) (1988). In the instant case the record shows defendant made his first appearance on 4 June 1990, within ninety-six hours of 31 May, when he was taken into custody. Although the first appearance itself is not a critical stage of criminal judicial proceedings at which a defendant is entitled to counsel, *State v. Detter*, 298 N.C. at 624, 260 S.E.2d at 582, we conclude defendant's Sixth Amendment right to counsel attached during his first appearance on 4 June, when the State's position against him solidified as to the murder charges and counsel was appointed. *State v. Tucker*, 331 N.C. 12, 33, 414 S.E.2d 548, 560 (1992). Hence, under *Detter* the 31 May evening interview and the 3 June interview were not protected by the Sixth Amendment right, and the Court did not abridge defendant's Sixth Amendment right in denying the motion to suppress.

[13] We next consider defendant's contention that his confessions were admitted in violation of his Fifth Amendment right to counsel. Defendant based both his motion to suppress and his arguments to the trial court on this right. Before this Court defendant argues no evidence supported the trial court's findings that he (i) did not request an attorney on 31 May and (ii) reinitiated contact with the officers on 3 June. We hold the court did not err in denying defendant's motion to suppress.

As to the 31 May evening interview, defendant argues that his question to Batchelor constituted a request for counsel, after which all questioning should have stopped. We disagree.

In *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d (1966), the United States Supreme Court held that the Fifth Amendment privilege against self-incrimination gives rise to a right to the presence of counsel during custodial interrogation. *Miranda* requires that an in-custody suspect be advised of his rights to counsel and silence. *Id.* at 444, 16 L. Ed. 2d at 706-707. These rights may be

waived. *Id.* However, if during the course of a custodial interrogation a suspect requests an attorney, all questioning must cease until an attorney is present, *Minnick v. Mississippi*, 498 U.S. 146, 152, 112 L. Ed. 2d 489, 498 (1990), or "the accused himself initiates further communication, exchanges, or conversations with the police," *Edwards v. Arizona*, 451 U.S. 477, 485, 68 L. Ed. 2d 378, 386 (1981); *accord State v. Allen*, 323 N.C. 208, 216, 372 S.E.2d 855, 860 (1988), *sentence vacated*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990), *on remand*, 331 N.C. 746, 417 S.E.2d 227 (1992), *cert. denied*, --- U.S. ---, 122 L. Ed. 2d 775 (1993).

To trigger the protections of *Minnick* and *Edwards*, the right to counsel must be specifically invoked. *Edwards*, 451 U.S. at 482, 68 L. Ed. 2d at 384. Specific invocation occurs when a suspect indicates "in any manner and at any stage of the process" that counsel is desired. *Miranda*, 384 U.S. at 444-45, 16 L. Ed. 2d at 707. "On occasion, an accused's asserted request for counsel may be ambiguous or equivocal." *Smith v. Illinois*, 469 U.S. 91, 95, 83 L. Ed. 2d 488, 494 (1984).

After the decision in *Smith*, this Court said

The Supreme Court has expressly left unresolved the question of what is the appropriate response to an ambiguous invocation of counsel. The majority rule, however, appears to be that, when faced with an ambiguous invocation of counsel, interrogation must immediately cease except for narrow questions designed to clarify the person's true intent.

*State v. Torres*, 330 N.C. 517, 529, 412 S.E.2d 20, 27 (1992) (citations omitted). Where officers do not seek to clarify intent but instead dissuade a suspect from exercising the right to have an attorney present during interrogation, ambiguity must be resolved in favor of the suspect, and any statement made "in the absence of counsel following police-initiated custodial interrogation 'is presumed involuntary and therefore inadmissible as substantive evidence at trial.' " *Id.* at 530, 412 S.E.2d at 27 (quoting *McNeil v. Wisconsin*, --- U.S. ---, ---, 115 L. Ed. 2d 158, 167-68 (1991)). This consequence follows even if the suspect is later read the *Miranda* rights and executes a waiver; and erroneous admission of a confession presumed involuntary warrants a new trial. *Id.* In *Torres* we also said

There are no "magic words" which must be uttered in order to invoke one's right to counsel. The crucial determination is whether the person has indicated "in any manner" a desire to have the help of an attorney *during custodial interrogation*. To require precise and exact language to invoke one's right to counsel would undermine *Miranda* by working to the disadvantage of those who arguably need its protections the most: the uneducated and those unfamiliar with the criminal justice system. *In deciding whether a person has invoked her right to counsel, therefore, a court must look not only at the words spoken, but the context in which they are spoken as well.*

*Id.* at 528, 412 S.E.2d at 26 (emphasis added) (citation omitted).

The trial court made no finding on whether defendant was in custody when he asked about an attorney. The State concedes, however, that based on the totality of circumstances defendant was then in custody. The court did find, however, that defendant was not interrogated at the time he asked about an attorney and competent evidence supports this finding. *See State v. Nations*, 319 N.C. at 325, 354 S.E.2d at 514 ("Findings of fact concerning the admissibility of a confession are conclusive and binding if supported by competent evidence.").

Following *Torres*, we next consider the context in which defendant spoke about an attorney. Defendant had confessed to Davenport that he was involved in the murders, confessed again in greater detail to Batchelor, and led Batchelor and Tellefsen to the place where he hid the murder weapon. Having been fingerprinted and given hair samples, defendant must have known arrest was imminent. In *Torres*, this Court also said, "[A] suspect in custody can certainly *assert* her right to have counsel present during her impending interrogation prior to *Miranda* warnings and the actual onset of questioning." 330 N.C. at 526, 412 S.E.2d at 25. By contrast, in the instant case, no interrogation was impending and unlike defendant Torres, defendant Gibbs was not told he would be questioned. Moreover, Batchelor made no attempt to dissuade defendant from exercising his right to have an attorney present during custodial interrogation. Instead, Batchelor's responses to defendant's question if he had to get an attorney constituted narrow clarification questions. When Batchelor told defendant the court would appoint an attorney to represent him if he asked for one, defendant did not ask for an attorney. Based on the entire context in which

defendant's inquiry was made, we conclude he did not invoke the right to counsel. Therefore, we hold the trial court did not err in concluding that as to the interview on the evening of 31 May, defendant's Fifth Amendment privilege was not abridged.

As to the 3 June interview, defendant argues that he did not reinitiate contact with the officers. Since we have concluded defendant did not invoke the right to counsel on 31 May, however, we need not reach this issue. Noting that the trial court found defendant waived his *Miranda* rights on 3 June, we conclude the court did not err in concluding his Fifth Amendment privilege against self-incrimination was not abridged. For all the foregoing reasons we hold the trial court did not err in concluding defendant's rights under the Fifth Amendment were not violated, and, therefore, in denying the motion to suppress his 31 May and 3 June statements.

[14] Defendant's next contention is that the evidence was insufficient to convict him of both conspiracy to commit burglary and conspiracy to commit first-degree murder; consequently, the trial court erred in failing to dismiss the charge of conspiracy to commit burglary and in failing to arrest judgment on the conviction, thereby prejudicing defendant at sentencing. We find these contentions to be without merit.

A criminal conspiracy is an agreement between two or more persons to do an unlawful act or to do a lawful act in an unlawful way or by unlawful means. *State v. Littlejohn*, 264 N.C. 571, 142 S.E.2d 132 (1965). To constitute a conspiracy it is not necessary that the parties should have come together and agreed in *express* terms to unite for a common object: " 'A mutual, implied understanding is sufficient, so far as the combination or conspiracy is concerned, to constitute the offense.' " *State v. Smith*, 237 N.C. 1, 16, 74 S.E.2d 291, 301 (1953), quoting *State v. Connor*, 179 N.C. 752, 103 S.E. 79 (1920). The conspiracy is the crime and not its execution. *State v. Lea*, 203 N.C. 13, 164 S.E. 737[, *cert. denied*, 287 U.S. 649, 77 L. Ed. 561] (1932). Therefore, no overt act is necessary to complete the crime of conspiracy. As soon as the union of wills for the unlawful purpose is perfected, the offense of conspiracy is completed. *State v. Goldberg*, 261 N.C. 181, 134 S.E.2d 334[, *cert. denied*, 377 U.S. 978, 12 L. Ed. 2d] (1964).

Once a conspiracy has been shown to exist the acts and declarations of each conspirator, done or uttered in furtherance

of a common illegal design, are admissible in evidence against all. *State v. Gibson*, 233 N.C. 691, 65 S.E.2d 508 (1951); *see State v. Goldberg, supra; State v. Summerlin*, 232 N.C. 333, 60 S.E.2d 322 (1950). The existence of a conspiracy may be established by direct or circumstantial evidence. To this end the unsupported testimony of a co-conspirator is sufficient to sustain a verdict, although the jury should receive and act upon such testimony with caution. *State v. Horton*, 275 N.C. 651, 170 S.E.2d 466 (1969)[, *cert. denied*, 398 U.S. 959, 26 L. Ed. 2d 545 (1970)]; *State v. Tilley*, 239 N.C. 245, 79 S.E.2d 473 (1954). However, "[d]irect proof of the charge [conspiracy] is not essential, for such is rarely obtainable. It may be, and generally is, established by a number of indefinite acts, each of which, standing alone, might have little weight, but, taken collectively, they point unerringly to the existence of a conspiracy." *State v. Whiteside*, 204 N.C. 710, 712-13, 169 S.E. 711, 712 (1933).

*State v. Bindyke*, 288 N.C. 608, 615-16, 220 S.E.2d 521, 526 (1975).

In the instant case, State's evidence showed the agreement to kill the Farris family was made several weeks before the murders took place. Applying *Bindyke*, we conclude the defendant committed the offense of conspiracy to commit murder when he, Doris, and Yvette agreed to kill Ann's family. The union of wills for the unlawful purpose of killing the family having been perfected, the offense of conspiracy to commit murder was completed. However, defendant, Doris, and Yvette did not also agree to commit the crime of first-degree burglary, and Doris was not charged with this crime. For these reasons we reject defendant's argument that the evidence showed one agreement to commit multiple offenses. Instead, on the night of the murder, a separate agreement was made between defendant and Yvette. That these two first watched Farris, Sr., leave and then approached the house in the dark, early morning hours when the family was likely to be sleeping is circumstantial evidence of an agreement to commit first-degree burglary. Their subsequent acts also show their agreement: That Yvette waited while defendant loosened the telephone wires and broke the glass and then followed him into the house constitutes evidence of acts in furtherance of the conspiracy to commit burglary. Taken collectively, the acts of defendant and Yvette point unerringly to the existence of a conspiracy to commit burglary. Viewing the evidence most favorably for the State and giving the State

the benefit of all reasonable inferences, *State v. Quick*, 329 N.C. 1, 19, 405 S.E.2d 179, 190 (1991), the evidence showed defendant and Yvette engaged in conspiracy to commit the offense of burglary. Therefore, we hold that the trial court did not err in failing to dismiss the conspiracy to commit burglary charge.

[15] Defendant next contends the court erred in its instructions on both conspiracy charges. As to conspiracy to commit first-degree murder, the court instructed that the State had to prove defendant "and at least one other person entered into an agreement." Both Yvette and Doris were named as co-conspirators in the indictment for this charge, and evidence showed defendant conspired with them to kill the Farris family. As to conspiracy to commit burglary, the court instructed that the State had to prove "that the defendant and at least one other person intended" the agreement to be carried out and if the jury found that the defendant "agreed with at least one other person to commit the crime of first degree burglary," it would be their duty to return a verdict of guilty of this charge. Only Yvette was named as a co-conspirator in the indictment for this charge, and evidence showed that defendant conspired with her to commit the offense. Defendant argues that the court never informed the jury that they were required to find beyond a reasonable doubt that defendant conspired with a person named in the indictment. Defendant argues further that he was erroneously convicted of two offenses of conspiring with "at least one other person" instead of the offenses for which he was indicted.

Defendant moved to dismiss the charge of conspiracy to commit burglary, argued that no instruction on this offense should be given, and renewed the objection after the court's charge to the jury. He also objected that both conspiracy instructions were "confusing" but omitted to bring to the attention of the trial court the error he complains of before this Court. By his omission defendant failed to preserve the alleged error for review. N.C. R. App. P. 10(b)(2). Although under Rule 10(c)(4), defendant could also have argued plain error before this Court, defendant makes no such argument. Nevertheless, we are persuaded by State's argument that the error, if any, did not amount to plain error, as there is no basis to believe the error had a probable impact on the verdicts. *State v. Odom*, 307 N.C. 655, 661, 300 S.E.2d 375, 379 (1983). State's evidence showed that only defendant and Yvette agreed to commit the burglary; there was no evidence from which the jurors could have found that "at least one other person" was

anyone other than Yvette. As to conspiracy to commit murder, there was no evidence from which the jurors could have found that "another person" was anyone other than Yvette or Doris. For these reasons we hold the errors committed by the court in instructing on the two conspiracies did not rise to the level of plain error.

[16] Defendant's next contention is that the trial court erred by misstating the elements of the crime of conspiracy to commit burglary and did not correct its error. We find that the error was cured.

In instructing on this charge, the court said, "Second, the State must prove to you beyond a reasonable doubt that the agreement was to commit *first degree murder*—strike that. The State must prove to you beyond a reasonable doubt that the agreement was to commit *first degree murder*." (Emphasis added.) Later, however, the court instructed as follows:

> Let me just go back to the first charge I instructed you on and that is the second charge, I believe, involving feloniously conspiring to commit first degree burglary. The court at that time, I believe, may have incorrectly instructed you as to what the elements of that offense were. I'll ask you to disregard that as I repeat that instruction for you solely on the charge of feloniously conspiring to commit the offense of first degree burglary. I'll give you the following instruction.

> The defendant has been accused of feloniously conspiring to commit first degree burglary. First degree burglary is defined as the breaking and entering the [sic] occupied dwelling house of another without his consent in the nighttime with the intent to commit a felony.

> Now I charge for you to find the defendant, Renwick Gibbs, guilty of feloniously conspiring to commit first degree burglary, the State must prove three things beyond a reasonable doubt.

> First, that the defendant and at least one other person entered into an agreement. Please recall the instructions I've given you as to how an agreement may be made under the theory of conspiracy.

Second, the State must prove to you beyond a reasonable doubt that the agreement was to commit the offense of *first degree burglary*, as I have defined that for you.

(Emphasis added.)

Defendant failed to object to the alleged error. "Since defendant failed to object at trial on the grounds she here alleges, we review for plain error. *State v. Odom*, 307 N.C. 655, 300 S.E.2d 375 (1983); N.C. R. App. P. 10(b)(2)." *State v. Allen*, 322 N.C. 176, 199, 367 S.E.2d 626, 638 (1988). In the instant case, the trial court acknowledged the error and gave a correct instruction. However, the alleged error falls far short of even that argued in *Allen*, wherein the trial court had to recall the jury to supplement his instruction. Therefore, we conclude this is not " 'the exceptional case where, after reviewing the entire record, it can be said the claimed error is a *"fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done." ' " *Odom,* 307 N.C. at 660, 300 S.E.2d at 378 (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir. 1982)).

[17]  Defendant next contends the trial court erred by instructing the jurors that they could convict him of conspiracy to commit murder if they found an agreement to commit felony murder. Defendant argues that since the crime of felony murder does not require that the killing be intentional, but conspiracy requires agreement, that is, intent to carry out a specific act, under the instruction given by the court an unintentional felony murder could erroneously serve as the basis for a conviction of conspiracy to commit murder. Defendant argues further that in the instant case the court's instruction lessened the State's burden of proof and thus prejudiced him. We do not find these arguments persuasive.

First-degree murder by reason of felony murder is committed when a victim is killed during the perpetration or attempted perpetration of certain enumerated felonies or a felony committed or attempted with the use of a deadly weapon. N.C.G.S. § 14-17 (Supp. 1992); *see also State v. Fields*, 315 N.C. 191, 199, 337 S.E.2d 518, 523 (1985) (holding statutory language "use of a deadly weapon" includes mere possession of deadly weapon). In felony murder, the killing may, but need not, be intentional. There must, however, be an unbroken chain of events leading from the attempted felony "to the act causing death, so that the homicide is part of a series

of events forming one continuous transaction." *State v. Shrader*, 290 N.C. 253, 261, 225 S.E.2d 522, 528 (1976).

In the instant case the court did not instruct the jurors that an unintentional killing during a felony would support a finding of first-degree murder by reason of felony murder. Rather, they were instructed that to find a conspiracy to commit murder, they must first find an agreement to commit first-degree murder. When they found an agreement to kill, the jurors eliminated the possibility that an unintentional felony murder formed the basis for the specific intent underlying the conspiracy of which they convicted defendant. On the specific facts of defendant's case, therefore, the principle that felony murder includes unintentional killings during felonies is irrelevant. Moreover, since the jurors also found defendant guilty of three counts of murder by reason of premeditation and deliberation, there is no rational basis for suggesting they could have found that the murders which occurred during the burglary were unintentional felony murders. Finding no prejudice, we overrule this assignment of error.

[18]  Defendant next contends the trial court erred by refusing to submit misdemeanor breaking or entering as a lesser included offense of first-degree burglary. Defendant objected to the court's refusal to give this instruction. Defendant argues there was substantial evidence showing that when he broke and entered the Farrises' house, he did not possess the requisite felonious intent. We disagree.

First-degree burglary is the breaking and entering of an occupied dwelling of another in the nighttime with the intent to commit a felony therein. N.C.G.S. § 14-51 (1986); *State v. Noland*, 312 N.C. 1, 320 S.E.2d 642 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369 (1985). Misdemeanor breaking or entering, a lesser included offense of burglary, does not require intent to commit a felony within the dwelling. N.C.G.S. § 14-54(b) (1986); *State v. Peacock*, 313 N.C. 554, 558, 330 S.E.2d 190, 193 (1985).

A trial court is required to instruct on a lesser included offense only when there is evidence to support a verdict finding the defendant guilty of the lesser offense. *State v. Tucker*, 329 N.C. 709, 721, 407 S.E.2d 805, 812 (1991). " 'The sole factor determining the judge's obligation to give such an instruction is the presence, or absence, of any evidence in the record which might convince a rational trier of fact to convict the defendant of a less grievous

STATE v. GIBBS

[335 N.C. 1 (1993)]

offense.'" *Peacock,* 313 N.C. at 558, 330 S.E.2d at 193 (quoting *State v. Wright,* 304 N.C. 349, 351, 283 S.E.2d 502, 503 (1981)).

In *Peacock,* defendant was charged with first-degree burglary and that offense was submitted to the jury. On appeal defendant argued the court erred in denying his request to submit in addition the lesser included offense of misdemeanor breaking or entering, and this Court agreed. *Id.* at 557-58, 330 S.E.2d at 192-93. We said there was evidence which could have convinced a rational trier of fact that defendant did not form the requisite intent to commit larceny at the time he broke and entered. The evidence included defendant's statements that he consumed LSD and alcohol; thought about going to talk to the victim about the rent and went to her apartment; and when she did not answer the door, broke in and stood there thinking about robbing her. In addition, defendant later told a detective "that it was *after* he was inside that he decided to rob [the victim]." *Id.* at 559, 330 S.E.2d at 194. We said defendant's statement to the detective lent credence to his "argument that a juror might also infer that he broke and entered without an intent to commit larceny." *Id.* at 559-60, 330 S.E.2d at 194.

In the instant case, the indictment alleged defendant committed first-degree burglary with the intent to commit the felony of first-degree murder. Defendant argues there was substantial evidence showing that when he broke and entered the Farrises' house, he had no felonious intent: His 31 May confession to Agent Batchelor, introduced by the State, included an assertion that he went to the house to see his wife and never intended to shoot anyone. In addition, his 3 June confession also included an assertion that he did not go to the house to shoot anyone but to talk to his wife. Notwithstanding defendant's after the fact assertions, overwhelming evidence showed that prior to breaking into the house, defendant had decided to kill his estranged wife's family. He conspired with Yvette and Doris to do so; had Doris purchase bullets; prepared a note to divert suspicion from himself; told his confederates he was going to kill the people; armed himself; and gloved, masked, and capped himself to hide his identity. In his 3 June confession defendant admitted that he watched Farris, Sr., drive away from the house, and this admission negated his assertion that the firearms were to keep Mr. Farris at bay. All the evidence relevant to the time before defendant broke and entered supports an inference that defendant possessed the intent to kill the Farris family. Unlike defendant Peacock, defendant Gibbs cannot point

to any evidence tending to negate this intent. There is no before the fact evidence to which defendant's statements afterwards could lend credence. There being no evidence from which a rational trier of fact could have concluded defendant did not possess the intent to commit murder, we conclude the trial court did not err in refusing to instruct on the lesser included offense of misdemeanor breaking or entering.

[19] Finally, defendant contends the court erred in instructing the jurors on the element of intent in burglary. As discussed above, the burglary indictment charged that defendant broke and entered with the intent to commit the felony of first-degree murder. Defendant argues the court erroneously instructed that if felony murder were proven by the State, the State would also have met its burden of proving the element of intent as to burglary. Therefore, defendant argues, the instruction permitted the jurors to convict defendant for a specific intent crime, burglary, based upon a finding that a murder occurred during the perpetration of that crime, disregarding whether the murder itself was intentional. We do not find these arguments persuasive.

Defendant having failed to make any objection in the trial court, our review is limited to determining whether defendant has shown the error to be so fundamental as to have a probable impact on the verdict. *State v. Odom*, 307 N.C. 655, 661, 300 S.E.2d 375, 379 (1983). Since the jurors found defendant guilty of premeditated and deliberated murder, it is not likely the error had any impact on the verdict. Since defendant cannot show the error had a probable impact on the verdict, we conclude the error did not rise to the level of plain error.

PENALTY PHASE ISSUES

[20] Defendant first contends the court erred in failing to submit as a mitigating circumstance, pursuant to N.C.G.S. § 15A-2000(f)(1), that the defendant had no significant history of prior criminal activity. We disagree.

At the sentencing charge conference, defendant tendered a written request for mitigating circumstances, and the following colloquy took place:

THE COURT: *Even though there was no evidence presented up*, does the defendant have any significant prior criminal history?

MR. PAUL: Are you asking the defendant?

THE COURT: Yes, sir. That is not on your list.

MR. PAUL: It's not on the list. There is, I think, one prior conviction that the State had raised to us in 1987, I believe, of an assault charge.

THE COURT: Is the defendant not requesting that be submitted as a mitigating factor? There is one in the statutory mitigating factors.

MR. PAUL: We are aware of that. I think it is a technical reason that it's not being submitted, by not being requested. *At this point in time there is no evidence at all of any prior crime the defendant has ever been convicted of before the jury.*

THE COURT: You are saying that is a technical decision made by you along with your client?

MR. PAUL: Yes, Your Honor. *At this point in time there is no evidence of any criminal conviction* and we are not raising that issue for the State to then put in an argument that he does have one and the specifics about what that conviction was. We think that would be far more damaging than raising the issue to argue for the jury to find it's a factor.

THE COURT: All right, sir.

(Emphasis added.)

The Criminal Procedure Act provides that in capital sentencings, "[i]nstructions *determined by the trial judge to be warranted by the evidence* shall be given by the court in its charge to the jury prior to its deliberation." N.C.G.S. § 15A-2000(b) (1988) (emphasis added). In *State v. Laws*, 325 N.C. 81, 381 S.E.2d 609 (1989), *sentence vacated*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *on remand*, 328 N.C. 550, 402 S.E.2d 573 (1991), *cert denied*, --- U.S. ---, 116 L. Ed. 2d 174 (1991), this Court stated:

The trial court is not required to instruct upon a statutory mitigating circumstance unless substantial evidence has been presented to the jury which would support a reasonable finding by the jury of the existence of the circumstance. *See State v. Wilson*, 322 N.C. 117, 367 S.E.2d 589 (1988); *State v. Lloyd*, 321 N.C. 301, 364 S.E.2d 316 (1988). The term "substantial evidence" means "that the evidence must be existing and real,

not just seeming or imaginary." *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980). The statutory mitigating circumstance of "no significant history of prior criminal activity" is not supported by the mere absence of any substantial evidence concerning the defendant's prior criminal history. *State v. Hutchins*, 303 N.C. 321, 355-56, 279 S.E.2d 788, 809 (1981), *cert. denied*, 464 U.S. 1065, 79 L. Ed. 2d 207 (1984). A silent record in this regard does not require submission of the mitigating circumstance. *Id.* An affirmative showing of a complete absence of *any* history of criminal activity need not be made, but some substantial evidence concerning the defendant's history of prior criminal activity — or lack of it — must be presented to the jury before the trial court may determine as a matter of law that the jury could reasonably find this mitigating circumstance from the evidence. *State v. Lloyd*, 321 N.C. 301, 364 S.E.2d 316 (1988).

*Id.* at 110-11, 381 S.E.2d at 626-27.

Recently, in *Delo v. Lashley*, 507 U.S. ---, 122 L. Ed. 2d 620 (1993), the United States Supreme Court revisited the issue of due process as affected by the sentencer's consideration of mitigating circumstances. Defendant Lashley was convicted of capital murder and at the sentencing conference one of his attorneys "asked the judge to instruct the jury on the mitigating circumstance that '[t]he defendant ha[d] no significant history of prior criminal activity,' Mo Rev Stat § 565.012.3(1) . . . ." *Id.* at ---, 122 L. Ed. 2d at 625 (alteration in original). Nevertheless, defense counsel repeatedly said she would not try to show that defendant lacked a criminal past. The trial court indicated defendant "would not be entitled to the requested instruction without supporting evidence." *Id.* The Supreme Court speculated that defendant's attorneys chose not to make the necessary proffer because they feared the prosecutor would be permitted to respond with evidence that defendant had engaged in criminal activity as a juvenile or because they wanted to avoid opening the door to evidence that defendant had committed other crimes as an adult. *Id.* For whatever reason, defendant presented no proof that he lacked a significant criminal history, the prosecutor did not submit any evidence that would support the mitigating circumstance, and the trial judge refused to give an instruction on it. *Id.* In a habeas corpus proceeding defendant argued the trial court's refusal to give the requested instruction violated due process, and the Court of Appeals for the Eighth

Circuit agreed, holding that the lack of any evidence whatever of defendant's prior criminal activity entitled him to the requested instruction. *Id.* at ---, 122 L. Ed. 2d at 626. The Supreme Court, however, disagreed, stating as follows:

> We have held that the sentencer must be allowed to consider in mitigation "any aspect of a defendant's character or record and any of the circumstances of the offense *that the defendant proffers* as a basis for a sentence less than death." Lockett, supra, at 604, 57 L Ed 2d 973, 98 S Ct 2954 (plurality opinion) (emphasis added). . . . But we never have suggested that the Constitution requires a state trial court to instruct the jury on mitigating circumstances in the absence of any supporting evidence.
>
> On the contrary, we have said that to comply with due process state courts need give jury instructions in capital cases only if the evidence so warrants. And, answering a question expressly reserved in Lockett, we recently made clear that a State may require the defendant " 'to bear the risk of nonpersuasion as to the existence of mitigating circumstances.' " Walton v Arizona, 497 US 639, 650, 111 L Ed 2d 511, 110 S Ct 3047 (1990) (plurality opinion) (quoting Lockett, supra, at 609, n 16, 57 L Ed 2d 973, 98 S Ct 2954).

*Id.* at ---, 122 L. Ed. 2d at 626 (citations omitted).

In light of N.C.G.S. § 15A-2000(b), *Laws*, and *Lashley*, the question before this Court is whether defendant presented evidence of his criminal history. The record shows defense counsel stated that no evidence of defendant's criminal history was presented by the defense or the State and the defense had chosen not to request submission of circumstance (f)(1). "Nothing in the Constitution obligates state courts to give mitigating circumstance instructions when no evidence is offered to support them." *Lashley*, 507 U.S. at ---, 122 L. Ed. 2d at 627. Since the record shows no evidence was offered to support an instruction on mitigating circumstance (f)(1), we hold the trial court did not err in failing to submit it.

[21] Defendant's next contention is that the court erred in instructing on circumstance (f)(7), the age of the defendant at the time of the crime, by limiting the circumstance solely to defendant's chronological age, twenty-six. We disagree. Since defendant failed

to object, our review is for plain error. *State v. Odom*, 307 N.C. 655, 661, 300 S.E.2d 375, 379 (1983).

The court instructed as follows:

> Number Three, you will also consider in each case, whether the age of the defendant at the time of the murder is a mitigating factor.
>
> The mitigating effect of the age of the defendant is for you to determine from all the facts and circumstances which you find from the evidence.

As noted above, the jurors found this mitigating circumstance existed. Hence, defendant could not have been prejudiced by the instruction and cannot show plain error.

[22]   Defendant next contends the trial court erred by submitting to the jury as aggravating circumstances for each murder both that the murder was committed during the course of a felony (burglary), N.C.G.S. § 15A-2000(e)(5), and that it was part of a course of conduct which involved commission of other crimes of violence against other persons, N.C.G.S. § 15A-2000(e)(11). Defendant argues that submission of both aggravating circumstances constituted impermissible and unconstitutional duplication in the evidence of aggravation. According to defendant, all the evidence supporting the former circumstance was subsumed by the evidence supporting the latter circumstance. In addition, the intent element of the burglary, intent to murder the Farris family, was identical to the intent to engage in the course of conduct, but the latter was submitted as a separate aggravating circumstance. We do not find defendant's arguments persuasive.

In a capital case the trial court may not submit multiple aggravating circumstances supported by precisely the same evidence. *State v. Quesinberry*, 319 N.C. 228, 239, 354 S.E.2d 446, 452 (1987) (finding error in robbery-murder sentencing where court submitted that the murder was committed (i) while defendant was engaged in robbery, N.C.G.S. § 15A-2000(e)(5), and (ii) for pecuniary gain, N.C.G.S. § 15A-2000(e)(6), and same evidence supported both circumstances); *State v. Goodman*, 298 N.C. 1, 29, 257 S.E.2d 569, 587 (1979) (finding error where same evidence supported two circumstances submitted, that the murder was committed to (i) avoid or prevent arrest, N.C.G.S. § 15A-2000(e)(4), and (ii) disrupt or hinder the lawful exercise of any governmental function or the enforce-

ment of laws, N.C.G.S. § 15A-2000(e)(7) ); *cf. State v. Vereen*, 312 N.C. 499, 515, 324 S.E.2d 250, 262 (1985) (finding nonprejudicial error in murder sentencing where court submitted two circumstances based on evidence of attempted rape, since evidence other than that of attempted rape also supported each circumstance); *accord State v. Gay*, 334 N.C. 467, 494, 434 S.E.2d 840, 856 (1993). Nevertheless, this Court has approved submitting the course of conduct aggravating circumstance where more than one victim is killed or injured. *State v. Cummings*, 332 N.C. 487, 422 S.E.2d 692 (1992) (defendant killed woman and twenty-six months later killed her sister); *State v. Roper*, 328 N.C. 337, 402 S.E.2d 600 (woman raped immediately after man with whom she was driving was killed by defendant), *cert. denied*, --- U.S. ---, 116 L. Ed. 2d 232 (1991); *State v. Jones*, 327 N.C. 439, 396 S.E.2d 309 (1990) (defendant fired shots endangering store customers, killed one, seriously wounded another, and committed armed robbery against store clerk); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986) (immediately after killing one victim, defendant fired gun at another), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Noland*, 312 N.C. 1, 320 S.E.2d 642 (1984) (defendant killed sister, then father of estranged wife); *State v. Craig*, 308 N.C. 446, 302 S.E.2d 740 (wife killed, then husband beaten), *cert. denied*, 464 U.S. 908, 78 L. Ed. 2d 247 (1983). In addition, when a jury finds a defendant guilty upon theories both of premeditation and deliberation and felony murder, and both theories are supported by the evidence, the felony underlying the felony murder may properly be submitted as an aggravating circumstance. *E.g., State v. Jennings*, 333 N.C. 579, 626, 430 S.E.2d 188, 213 (1993).

In *Cummings*, we also said

In determining whether the evidence tends to show that another crime and the crime charged were part of a course of conduct, and therefore constitute a proper basis to submit the course of conduct aggravating circumstance to the jury, the trial court must consider "a number of factors, among them the temporal proximity of the events to one another, a recurrent *modus operandi*, and motivation by the same reasons."

332 N.C. at 509, 422 S.E.2d at 704 (quoting *State v. Price*, 326 N.C. 56, 81, 388 S.E.2d 84, 98, *sentence vacated*, 498 U.S. 802, 112 L. Ed. 2d 7 (1990), *on remand*, 331 N.C. 620, 418 S.E.2d 169 (1992), *sentence vacated*, --- U.S. ---, 122 L. Ed. 2d 113 (1993) ).

*Cummings* makes clear that when an additional act of violence against the person occurs much later in time, intent of the perpetrator is relevant in determining whether all the acts, though individual, constitute a course of conduct. *See also State v. Williams,* 305 N.C. 656, 292 S.E.2d 243, 261 (approving submitting course of conduct circumstance where acts of violence were committed within hours of each other in different towns), *cert. denied,* 459 U.S. 1056, 74 L. Ed. 2d 622 (1982).

In *Jones,* a robbery-murder case, the trial court submitted as aggravating circumstances that the murder was committed (i) for pecuniary gain, N.C.G.S. § 15A-2000(e)(6), and (ii) as part of a course of violent conduct, N.C.G.S. § 15A-2000(e)(11). 327 N.C. at 452, 396 S.E.2d at 316. This Court concluded the two circumstances were not supported by the same evidence. Evidence that the murder was committed for pecuniary gain included that defendant (i) said he went to the convenience store to steal, (ii) said, "This is a stickup," upon entering, (iii) ordered the manager to open the cash register and give him money, and (iv) took the cash register from the store. Evidence that defendant engaged in a violent course of conduct included that he (i) fired shots endangering everyone in the store, (ii) killed one person, (iii) seriously injured another, and (iv) committed an armed robbery against a clerk. *Id.* at 452, 396 S.E.2d at 316-17. The Court also considered whether the two circumstances were "inherently duplicative." *Id.* Concluding they were not, the Court said, "Defendant need not have engaged in the violent course of conduct against others in order to have had pecuniary gain as a motive for the murder, and vice versa." *Id.*

In the instant case, each aggravating circumstance was based on evidence not required to prove the other. Evidence that defendant committed burglary is that he went to the house at night while the family was sleeping, broke the glass in the door, and entered. We agree with defendant's argument that proof of first-degree burglary also requires proof of an intent to commit some felony. However, proof that defendant committed *the* capital felony during the burglary did not also require proof of the commission of acts of violence towards the other victims. The (e)(5) circumstance is based on the commission of *a* capital felony during the commission of some other felony. Moreover, the course of conduct circumstance neither required nor relied on proof of burglary. Evidence that defendant engaged in a violent course of conduct is that he first shot and killed Shamika and then shot and killed her mother

and brother. This circumstance was based squarely on evidence that after the first murder, defendant immediately committed acts of violence against two other persons. Defendant need not have engaged in a violent course of conduct in order to have committed *a* capital felony in the course of the burglary. Concluding that different evidence supported each aggravating circumstance and that on the peculiar facts of the instant case, the two circumstances were not inherently duplicative, we hold the trial court did not err in submitting both.

[23] Defendant next contends that as to Shamika, the evidence was insufficient to warrant submission of aggravating circumstance N.C.G.S. § 15A-2000(e)(9), that the capital felony was especially heinous, atrocious, or cruel. Again, we disagree.

In determining sufficiency of the evidence to support this circumstance, the trial court must consider the evidence in the light most favorable to the State. *State v. Quick*, 329 N.C. 1, 31, 405 S.E.2d 179, 197 (1991). The State is entitled to every reasonable inference to be drawn from the facts. Contradictions and discrepancies are for the jury to resolve, and all evidence admitted which is favorable to the State is to be considered. *State v. Stanley*, 310 N.C. 332, 339, 312 S.E.2d 393, 397 (1984).

In *Stanley*, the Court said, "[P]ropriety of submitting this aggravating factor turns on 'the peculiar surrounding facts of the capital offense under consideration.' *State v. Pinch*, 306 N.C. 1, 35, 292 S.E.2d 203, 228, *cert. denied*, --- U.S. ---, 103 S.Ct. 474, 74 L. Ed. 2d 622 (1982)." *Id.* at 335, 312 S.E.2d at 395. Moreover, "[t]he capital offense must not be *merely* heinous, atrocious, or cruel; it must be *especially* heinous, atrocious, or cruel." *Id.* at 336, 312 S.E.2d at 396. In addition, the Court has declined to limit the scope of the circumstance to cases involving only physical injury or torture prior to death. *State v. Huffstetler*, 312 N.C. 92, 115, 322 S.E.2d 110, 125 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985); *State v. Oliver*, 309 N.C. 326, 344, 307 S.E.2d 304, 317 (1983). We have identified several types of murders which may warrant submission of circumstance (e)(9): One type includes killings physically agonizing or otherwise dehumanizing to the victim. *State v. Lloyd*, 321 N.C. 301, 319, 364 S.E.2d 316, 328 (1988). A second type includes killings less violent but "conscienceless, pitiless, or unnecessarily torturous to the victim," *State v. Brown*, 315 N.C. 40, 65, 337 S.E.2d 808, 826-27 (1985), including those which leave

the victim in her "last moments aware of but helpless to prevent impending death," *State v. Hamlet*, 312 N.C. 162, 175, 321 S.E.2d 837, 846 (1984). A third type exists where "the killing demonstrates an unusual depravity of mind on the part of the defendant beyond that normally present in first-degree murder." *Brown*, 315 N.C. at 65, 337 S.E.2d at 827.

*Stanley* and *Hamlet* are representative of cases in which this Court has held the evidence was insufficient to support submission of the circumstance. In *Stanley*, the Court said

> [T]he evidence here is insufficient. It leaves the existence of the facts essential to support the ultimate conclusion in a state of conjecture and surmise. The evidence shows defendant fired nine shots at the victim, all in rapid succession, from an automobile which he never left. . . . There is no evidence that defendant intended that his wife suffer a prolonged, torturous death, or that she in fact suffered a prolonged, torturous death. . . .
>
> . . . [E]vidence that the victim said "Please Stan" sometime before she was shot . . . does not support a reasonable inference that the victim was mercilessly shot to death while begging for her life. What the words "Please Stan" might have referred to remains in the realm of conjecture and surmise. . . . Likewise, the evidence does not support a reasonable inference that defendant, who never left his car, heard these words uttered by the victim who was standing on the curb.

310 N.C. at 340-41, 312 S.E.2d at 398.

In *Hamlet*, the Court said

> [T]he evidence in the present case was insufficient to support the submission of the aggravating factor to the jury. The evidence showed that the defendant fired almost immediately upon the victim['s] entering the vestibule. The first shot to strike Bramlett hit him in the head. . . . The victim was unconscious and unable to feel any pain after the shot to his head. . . . Though death was not instantaneous, the victim did not linger for any extended period of time following the shooting. . . .

The State also contends that there was evidence to support an inference that the victim suffered psychological torture

prior to the killing. We disagree. The evidence in the present case tended to show that the victim was unaware of the assailant's presence until the victim entered the vestibule where he was shot immediately. There was no evidence upon which to base an inference that Bramlett was left "in his last moments as a sentient being, aware but helpless to prevent impending death."

312 N.C. at 175-76, 321 S.E.2d at 846 (quoting *Oliver*, 309 N.C. at 346, 307 S.E.2d at 318) (citations omitted).

Applying the foregoing principles of law, we conclude that in the instant case the evidence was sufficient to support submitting the (e)(9) circumstance to the jury. Ample evidence showed that the murders, including that of Shamika, were committed according to a calculated plan. The victims, including Shamika, were part of defendant's extended family. Defendant's statements showed that while Louise Farris pleaded with defendant not to hurt them, invoking the family relationship, her daughter yelled and cried louder and louder. At this point, defendant caused the two women to be tied and gagged. Shamika, her ankles bound and her hands tied behind her back, continued to cry. The evidence tends to show Shamika was helpless and in terror. She could not plead for her life with words after being gagged, but the evidence shows she was suffering under knowledge that her death was imminent. It is difficult to perceive how she could have imagined anything different when defendant, standing within a few feet of her, placed the muzzle of his 30-30 rifle on her forehead. Evidence that defendant shot Shamika because her crying made him nervous is evidence that in killing her, he acted in a conscienceless, pitiless manner. *Stanley*, wherein there was no evidence that the defendant heard his victim, is distinguishable. *Hamlet*, wherein there was no evidence that the victim was aware of defendant's presence, is also distinguishable. In *Stanley*, the Court also said that " '[i]t is not merely the specific and narrow method in which a victim is killed which makes a murder heinous, atrocious, and cruel; rather, it is the entire set of circumstances surrounding the killing.' " 310 N.C. at 338-39, 312 S.E.2d at 397 (quoting *Magill v. State*, 428 So. 2d 649, 651 (Fla. 1983) ) (alteration in original). Viewing all the circumstances surrounding Shamika's murder, we conclude there was sufficient evidence that it was especially heinous, atrocious, or cruel. Therefore, we hold the trial court did not err in submitting aggravating circumstance (e)(9) to the jury.

[24] Finally defendant contends improprieties in the prosecutor's sentencing argument denied defendant a fair trial and viewed collectively warrant a new trial. Again we disagree.

> As at trial, in capital sentencings
>
>> counsel are allowed wide latitude in arguing hotly contested cases. *E.g., State v. Brown*, 320 N.C. 179, 358 S.E.2d 1, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987); *State v. Huffstetler*, 312 N.C. 92, 322 S.E.2d 110 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985). "Counsel for each side may argue to the jury the facts in evidence and all reasonable inferences to be drawn therefrom together with the relevant law so as to present his or her side of the case." *Huffstetler*, 312 N.C. at 112, 322 S.E.2d at 123. Whether an advocate has abused this privilege is left largely to the sound discretion of the trial court. *Id.* Where the defendant has failed to object to an alleged impropriety in the [S]tate's argument and so flag the error for the trial court, an appellate court may review the argument notwithstanding. But "the impropriety . . . must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it." *State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761.
>
> *State v. Artis*, 325 N.C. 278, 323, 384 S.E.2d 470, 496 (1989), *sentence vacated*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand*, 329 N.C. 679, 406 S.E.2d 827 (1991). Regarding appellate review, this Court has said
>
>> [P]rosecutorial statements are not placed in an isolated vacuum on appeal. Fair consideration must be given to the context in which the remarks were made and to the overall factual circumstances to which they referred. Moreover, it must be remembered that the prosecutor of a capital case has a duty to pursue ardently the goal of persuading the jury that the facts in evidence warrant imposition of the ultimate penalty. G.S. 15A-2000(a)(4); *State v. Myers*, 299 N.C. 671, 680, 263 S.E.2d 768, 774 (1980); *State v. Johnson*, 298 N.C. 355, 367, 259 S.E.2d 752, 760 (1979); *State v. Westbrook*, 279 N.C. 18, 37, 181 S.E.2d 572, 583 (1971), *death sentence vacated*, 408 U.S. 939, 92 S. Ct. 2873, 33 L. Ed. 2d 761 (1972).

STATE v. GIBBS

[335 N.C. 1 (1993)]

*State v. Pinch*, 306 N.C. 1, 24, 292 S.E.2d 203, 221-22, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *overruled on other grounds by State v. Wilson*, 322 N.C. 117, 367 S.E.2d 589 (1988), *and overruled on other grounds by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988). With these principles in mind, we turn to defendant's arguments.

Defendant first argues that the trial court erred in overruling his objection to the prosecutor's twice quoting from *State v. Rogers*, 275 N.C. 411, 168 S.E.2d 345 (1969). Arguing against mitigating circumstance (f)(2), that the capital felony was committed while defendant was under the influence of mental or emotional disturbance, the prosecutor stated that low mentality is not a defense to a criminal charge, evidence of low mentality is irrelevant, and the test of accountability is whether a defendant has the ability to distinguish right from wrong. Arguing against finding the nonstatutory mitigating circumstance that defendant had an I.Q. of 61, the prosecutor again stated that the test of accountability does not depend on intelligence or general mental capacity.

In *Rogers* this Court said

It has been held that low mentality in itself is no defense to a criminal charge. *State v. Jackson*, 346 Mo. 474, 142 S.W.2d 45. Evidence of low mentality is irrelevant and its exclusion is not error. *State v. Jenkins*, 208 N.C. 740, 182 S.E. 324; *State v. Scales*, 242 N.C. 400, 87 S.E.2d 916. The test of accountability does not depend on intelligence, education, or general mental capacity. *Young v. State*, Fla., 140 So. 2d 97 (evidence that defendant had very low I.Q. was excluded as immaterial). The true test of mental responsibility in North Carolina and in a majority of American jurisdictions is whether defendant has the ability to distinguish right from wrong at the time and with respect to the matter under investigation. *State v. Willis*, 255 N.C. 473, 121 S.E.2d 854; *State v. Scales, supra; State v. Grayson*, 239 N.C. 453, 80 S.E.2d 387; *Leland v. Oregon*, 343 U.S. 790, 96 L. Ed. 1302, 72 S. Ct. 1002, *reh'g denied*, 344 U.S. 848, 97 L. Ed. 659, 73 S. Ct. 4.

275 N.C. at 425, 168 S.E.2d at 353. The principle that low mentality is not a defense to a charge is irrelevant to sentencing, and for this reason, we explicitly reject State's argument that *Rogers* is "tangentially relevant" to a capital sentencing procedure. Instead, in a capital case, mitigating circumstances serve to reduce the

culpability of the killing, " 'making it less deserving of the extreme punishment than other first-degree murders.' " *State v. Boyd*, 311 N.C. 408, 421, 319 S.E.2d 189, 198 (1984) (quoting *State v. Brown*, 306 N.C. 151, 178, 293 S.E.2d 569, 586 (1982)).

Defendant argues that at sentencing, he relied heavily on impaired capacity to reduce his moral culpability and that either the prosecutor did not understand the purpose of mitigating circumstances or his argument was calculated to prejudice the jury. We do not find these arguments persuasive. Three mitigating circumstances based on mental capacity, two statutory and one nonstatutory, were submitted to the jury. Of these, the jury found one statutory circumstance, that the capital felony was committed while the defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2), and one nonstatutory, that his I.Q. was in the borderline mentally retarded range of intelligence. Although in arguing against these two individual circumstances, the prosecutor quoted irrelevant law, he also repeatedly reminded the jury that they were being asked to consider whether the mitigating circumstances reduced defendant's culpability. Moreover, most of the prosecutor's argument against mitigating circumstance (f)(2) emphasized Fisher's evidence that the greater component of defendant's incapacity consisted of his personality disorder, not his low mental capacity, and that low mental capacity is not synonymous with mental disturbance. In arguing against the nonstatutory circumstance of borderline mental retardation, the prosecutor's reference to *Rogers* was fleeting. By contrast, defense counsel emphasized over and over that mitigation is not justification. In addition the court correctly instructed the jurors that a mitigating circumstance does not constitute justification but may be considered as reducing moral culpability or making a killing less deserving of the extreme punishment and instructed correctly as to circumstance (f)(2) and as to defendant's borderline mental retardation. Considering the overall factual circumstances, we conclude defendant has failed to show prejudice.

[25] Defendant's next contention relates to the prosecutor's response to defense counsel's objection to the second mention of *Rogers*. The prosecutor asked, "You don't think that's the law? Ask the Judge. He'll tell you." Defendant argues that by its silence the court implied approval of the prosecutor's argument. Again, we note that the jurors found the existence of the nonstatutory mitigating circumstance of borderline retardation, that defense

counsel was permitted to argue at length that mitigation is not justification, and that the court correctly instructed the jurors on the circumstance. Again considering the overall factual circumstances, we conclude defendant has failed to show prejudicial error.

[26] Defendant next contends the prosecutor's argument was prejudicial in that, by repeatedly linking defendant and Yvette, it encouraged the jury to return death sentences against him based on Yvette's conduct. Again we disagree.

Construing N.C.G.S. § 15A-2000(e), this Court has said that aggravating circumstances are limited to those set out in the statute. *State v. Brown*, 320 N.C. 179, 199, 358 S.E.2d 1, 15, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987). The capital sentencing statute does not provide for an aggravating circumstance based on a defendant's associating others in the capital felony. By contrast, the Fair Sentencing Act provides for such factors. N.C.G.S. § 15A-1340.4(a)(1)a, -1340.4(a)(1)*l* (Supp. 1992). Nevertheless, under N.C.G.S. § 15A-2000(a)(3), all evidence submitted during the guilt-innocence phase of a capital case is competent for the jury to consider at sentencing. That capital sentencing must focus on the individual defendant, his crimes, personal culpability, and mitigation, does not also mean that no mention may be made of a co-defendant actively involved at the scene of the crime. *State v. Oliver*, 309 N.C. 326, 365, 307 S.E.2d 304, 329 (1983).

In the instant case, to prove the noncapital felonies of conspiracy to commit murder and to commit burglary, the State presented extensive evidence of Yvette's involvement in the crimes. Even though Yvette was not tried jointly with defendant, that the jury was made fully aware of her participation is shown by their having convicted defendant of the two conspiracy charges. Although defense counsel made one objection to the prosecutor's linking defendant and Yvette, before this Court defendant complains for the first time of four references to Yvette in the prosecutor's argument. While we agree that the proper focus of sentencing is the defendant's individualized conduct, in light of the jury's extensive knowledge of Yvette's involvement, we find no prejudice.

[27] Defendant's next contention relates to the nonstatutory mitigating circumstance that during incarceration after his arrest, defendant had shown the ability to conform and adapt to the prison environment. Arguing against finding this circumstance, the prosecutor told the jurors, "You watched them bring him in, bring

him out. He's been under guard." Defendant argues this statement was calculated to prejudice the jury and constituted a gross impropriety. Again, we disagree.

The thrust of the prosecutor's argument against finding the circumstance was directed to recapitulating Fisher's evidence that he could not predict defendant's dangerousness in the future. Nevertheless, the jury was entitled to consider also that while incarcerated, defendant had little opportunity to do anything other than cooperate with his jailors. For these reasons, we conclude the prosecutor's argument was not so grossly improper as to require intervention by the court.

[28] Defendant's next contention relates to aggravating circumstance (e)(5), that the capital felony was committed while defendant was engaged in the commission of a burglary. Defendant argues that the prosecutor misstated the law and impermissibly lessened the State's burden of proof by telling the jurors that since they had found defendant guilty of first-degree burglary, they also found the existence of this circumstance. Again we disagree.

In a capital sentencing proceeding, "there shall not be any requirement to resubmit evidence presented during the guilt determination phase of the case, unless a new jury is impaneled, but all such evidence is competent for the jury's consideration in passing on punishment." N.C.G.S. § 15A-2000(a)(3) (1988). Applying this principle in State v. Williams, 308 N.C. 47, 301 S.E.2d 335, cert. denied, 464 U.S. 865, 78 L. Ed. 2d 177 (1983), this Court noted that at trial the court fully instructed the jury on the elements of first-degree burglary, including the defense of intoxication; the jury found defendant guilty; and no additional evidence concerning intoxication was presented by the defendant in the sentencing phase. The Court stated, "It would be unreasonable to believe that the jury would have come to a different conclusion during the sentencing phase, based upon the same evidence it had previously considered and rejected." Id. at 73, 301 S.E.2d at 335.

In the instant case, the jurors found defendant guilty of first-degree burglary and first-degree murder by reason both of premeditation and deliberation and felony murder. Before this Court defendant does not argue that at sentencing he presented new evidence relevant to first-degree burglary. However, even if defendant's sentencing evidence included new evidence bearing on the element of intent in first-degree burglary, the jury had resolved the

issue against him by having already found him guilty of first-degree burglary. Thus the State did not commit error in arguing that having found defendant guilty of first-degree burglary, the jurors had also determined the existence of aggravating circumstance (e)(5). Therefore, we conclude there was no gross impropriety.

**[29]** . Defendant's next contention relates to aggravating circumstance (e)(9), that the capital felony was especially heinous, atrocious, or cruel. Defendant argues that the prosecutor misstated the law by arguing that evidence of premeditation and deliberation also constituted evidence that the murders were especially heinous, atrocious, or cruel. Reading the argument in its entirety, however, we find the prosecutor did not mention premeditation and deliberation. Moreover, the thrust of the argument was that the cold calculation with which defendant undertook to and did execute the victims tended to prove defendant's cruelty and depravity of mind and his intention that the victims be subjected to mental suffering. Therefore, we conclude there was no gross impropriety.

**[30]** Defendant next contends it was grossly improper for the prosecutor to argue that the jurors should recommend death because "[i]t's the only way that you can be assured that he won't do it again." Defendant argues this statement was an implicit reference to parole. However, since defendant concedes that this Court has previously held that in a capital case, the prosecutor may argue for death because of its deterrent effect on the defendant personally, *e.g., State v. Johnson*, 298 N.C. 355, 367, 259 S.E.2d 752, 760 (1979), we conclude the argument was not grossly improper.

**[31]** Finally defendant contends it was grossly improper for the prosecutor to quote the Sixth Commandment in his argument. Defendant argues that North Carolina courts have repeatedly held that Biblical arguments are not proper. We disagree.

. Of Biblical arguments this Court has said

Neither the "law" nor the "facts in evidence" include biblical passages, and, strictly speaking, it is improper for a party either to base or to color his arguments with such extraneous material. *See State v. Cherry*, 298 N.C. 86, 257 S.E.2d 551. However, this Court has repeatedly noted the wide latitude allowed counsel in arguing hotly contested cases, *e.g., State v. Britt*, 288 N.C. 699, 220 S.E.2d 283 (1975); *State v. Pinch*, 306 N.C. 1, 292 S.E.2d 203, and it has found biblical arguments

to fall within permissible margins more often than not. *See,
e.g., State v. Hunt,* 323 N.C. 407, 373 S.E.2d 400 (1988); *Brown,*
320 N.C. 179, 358 S.E.2d 1; *State v. Oliver,* 309 N.C. 326,
307 S.E.2d 304. This Court has distinguished as improper
remarks that state law is divinely inspired, *Oliver,* or that
law officers are "ordained" by God. *State v. Moose,* 310 N.C.
482, 501, 313 S.E.2d 507, 519-20.

*State v. Artis,* 325 N.C. 278, 331, 384 S.E.2d 470, 500 (1989), *sentence
vacated,* 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand,* 329
N.C. 679, 406 S.E.2d 827 (1991).

Defendant has presented no argument that the prosecutor's
comment comes within the category of improper remarks precluded
by *Artis,* and we are satisfied the quotation was not outside the
wide latitude permitted by *Artis.* We conclude, therefore, that
there was no gross impropriety.

In sum, as to defendant's contentions based on alleged error
brought to the attention of the trial court, we have concluded
defendant failed to show prejudice. As to errors raised for the
first time in this Court, we have concluded there were no gross
improprieties. We hold, therefore, that the argument, taken as
a whole, was not improper.

PRESERVATION ISSUES

[32-35]  Defendant raises four additional issues which he concedes
have been decided against him by this Court: (i) The trial court
erred by denying defendant's motion for disclosure of aggravating
and mitigating circumstances; (ii) the court erred by submitting
aggravating circumstance (e)(9), that the capital felony was especial-
ly heinous, atrocious, or cruel, because the circumstance is imper-
missibly vague on its face and as applied; (iii) the court erred
in instructing the jurors in the penalty phase that if they found
the aggravating and mitigating circumstances were in equipoise,
then they were also to consider whether to recommend death;
and (iv) the trial court erred in refusing to arrest judgment on
defendant's conviction of first-degree burglary.

We have considered defendant's arguments on these issues
and find no compelling reason to depart from our prior holdings.
Therefore, we overrule these assignments of error.

PROPORTIONALITY

[36] Having found defendant's trial and capital sentencing proceeding free of prejudicial error, we are required by statute to review the record and determine whether (i) the record supports the jury's finding the aggravating circumstances on which the court based its sentence of death, (ii) the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (iii) the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and defendant. N.C.G.S. § 15A-2000(d)(2) (1988); *State v. McCollum*, 334 N.C. 208, 239, 433 S.E.2d 144, 161 (1993); *State v. Robbins*, 319 N.C. 465, 526, 356 S.E.2d 279, 315, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987).

We have held that the record supports the jury's finding of the aggravating circumstances that (i) the capital felony was committed during the commission of a felony (burglary), N.C.G.S. § 15A-2000(e)(5); (ii) the capital felony was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and (iii) the murder was part of a course of conduct which included other crimes of violence committed by the defendant against additional victims, N.C.G.S. § 15A-2000(e)(11). We also conclude nothing in the record suggests that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

We turn to our final statutory duty, proportionality review, and first

compare similar cases in a pool consisting of

> *all cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

*State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983).

*State v. Syriani*, 333 N.C. 350, 400, 428 S.E.2d 118, 146, *cert. denied*, No. 93-5077, 1993 WL 248196 (U.S., Nov. 1, 1993). Only cases found

to be free of error in both the guilt-innocence and sentencing phases are considered. *Id.* Our consideration is limited "to those cases 'which are roughly similar with regard to the crime *and* the defendant . . . .' *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985) (emphasis added)." *Id.* at 400-401, 428 S.E.2d at 426. If juries have consistently returned death sentences in those similar cases, a strong basis exists for concluding that the death sentence under consideration is not excessive or disproportionate. However, if juries have consistently returned life sentences in the similar cases, a strong basis exists for concluding that the sentence under consideration is excessive or disproportionate. *Id.* at 401, 428 S.E.2d at 146.

Salient characteristics of defendant's case include (i) murders of three members of a family, a mother and her children who were also defendant's mother-in-law, sister-, and brother-in-law, preceded by defendant's threats, made to his wife, to harm the family; (ii) a calculated plan of attack by defendant, including efforts to disguise his identity; (iii) fear on the part of the victims, who recognized defendant and were bound and gagged; and (iv) as to the first victim, a conscienceless and pitiless shooting found to be especially heinous, atrocious, or cruel by the jury, which also found the subsequent shootings especially heinous, atrocious, or cruel.

Defendant was convicted of all three first-degree murders based upon theories both of premeditation and deliberation and felony murder and also was convicted of first-degree burglary and two counts of conspiracy. As to every murder, the jury found all three aggravating circumstances submitted: that the capital felony was committed during a felony (burglary), that the capital felony was especially heinous, atrocious, or cruel, and that the murder was part of a course of conduct in which defendant committed other crimes of violence against other victims. Also as to each murder the jury found three statutory mitigating circumstances and three nonstatutory mitigating circumstances. The jurors considered but declined to find fourteen additional mitigating circumstances.

"Of the cases in which this Court has found the death penalty disproportionate, only two involved the 'especially heinous, atrocious, or cruel' aggravating circumstance. *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d

170 (1983)." *Syriani*, 333 N.C. at 401, 428 S.E.2d at 146-47. We find *Stokes* and *Bondurant* are not similar to the instant case.

Significant dissimilarities between *Stokes* and the instant case include that (i) in *Stokes* there was only one victim; defendant Gibbs shot three people; (ii) defendant Stokes was seventeen years old; defendant Gibbs was twenty-six; (iii) in *Stokes* defendant was convicted on a felony murder theory; defendant Gibbs was convicted on theories both of premeditation and deliberation and felony murder and there was ample evidence of premeditation; and (iv) in *Stokes* there was no evidence showing who was the ringleader; in this case defendant Gibbs clearly was the leader in the murders of the Farris family.

Significant dissimilarities between *Bondurant* and the instant case include (i) in *Bondurant* there was only one victim and (ii) defendant Bondurant immediately exhibited concern for the victim's life and remorse by helping him get medical treatment, whereas defendant Gibbs went home and went to sleep.

In *State v. McCollum*, 334 N.C. at 240-42, 433 S.E.2d at 162-63, this Court reviewed all seven cases, including *Stokes* and *Bondurant*, in which we have found the death penalty disproportionate.[1] We have already distinguished *Stokes* and *Bondurant*, and of the other five cases, none involved a multiple homicide. In only one case, *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985), were multiple aggravating circumstances found to exist. However, in *Young* only two such circumstances were found; and this Court "focused on the failure of the jury in *Young* to find either" that the murder was especially heinous, atrocious, or cruel, or that it "was committed as part of a course of conduct which included the commission of violence against another person or persons." *State v. McCollum*, 334 N.C. at 241, 433 S.E.2d at 162. These aggravating circumstances are two of the three found by the jury in the instant case. Based on the three aggravating circumstances found in the instant case, we conclude it is also unlike the five cases in addition to *Stokes* and *Bondurant* discussed in *McCollum*.

---

1. The five cases in addition to *Stokes* and *Bondurant* are as follows: *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); and *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

We have reviewed the record in *State v. Rainey*, 331 N.C. 259, 415 S.E.2d 337 (1992), a triple homicide case, and determined that the jurors found only one aggravating circumstance as to each of the three victims, that the murder was part of a course of conduct involving violence towards others. Also finding the existence of four mitigating circumstances as to each of the three murders, the jury recommended life sentences. *Id.* at 260, 415 S.E.2d at 337.

In *Syriani* and *Young* we found the existence of the (e)(9) circumstance—that the capital felony was especially heinous, atrocious, or cruel—significant; and we conclude its existence distinguishes the instant case from *Rainey*. We note also that none of the four cases[2] discussed in *Syriani* in which juries recommended life after finding the existence of the (e)(9) circumstance was a multiple homicide case, and thus those cases are dissimilar to the instant case.

Focusing first on evidence of his deficient mentality and mitigating circumstances based thereon, defendant relies on cases in which there was substantial evidence of impaired capacity or emotional disturbance and the juries returned life sentences: *State v. Anderson*, 303 N.C. 185, 278 S.E.2d 238 (1981); *State v. Clark*, 300 N.C. 116, 265 S.E.2d 204 (1980); and *State v. Franks*, 300 N.C. 1, 265 S.E.2d 177 (1980). We note first that none of these cases involved a multiple homicide, thus the crimes are dissimilar. In *Anderson*, evidence showed defendant "had some mental disorders resulting from an automobile accident," was "very upset and depressed," and "went to a mental health facility for help in dealing with his anger and jealousy." 303 N.C. at 188, 278 S.E.2d at 240. When questioned by his mother about the shooting, defendant appeared to know nothing about it. *Id.* Based on these facts, we find that in the instant case, defendant's mentality is dissimilar to that of defendant Anderson.

In *Clark*, defendant gave notice of his intent to rely on the defense of insanity. 300 N.C. at 117, 265 S.E.2d at 205. Defense counsel filed a motion questioning defendant's capacity to proceed

---

2. *State v. Spruill*, 320 N.C. 688, 360 S.E.2d 667 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 934 (1988); *State v. Huffstetler*, 312 N.C. 92, 322 S.E.2d 110; *State v. Boyd*, 311 N.C. 408, 319 S.E.2d 189 (1984), *cert. denied*, 471 U.S. 1030, 85 L. Ed. 2d 324 (1985); *State v. Martin*, 303 N.C. 246, 278 S.E.2d 214, *cert. denied*, 454 U.S. 933, 70 L. Ed. 2d 240 (1981).

to trial, and the court held defendant was competent. *Id.* Upon conflicting evidence, the trial court concluded defendant had a "paranoid personality, precipitated by drugs and alcohol and m[ight] have psychotic episodes." *Id.* at 122, 265 S.E.2d at 208. Based on these facts, defendant Gibbs' mentality is dissimilar.

In *Franks*, defendant was an alcoholic who testified he did not know why he killed the victim — "[S]omething just told me to do it and I got up and choked her." 300 N.C. at 5, 265 S.E.2d at 179. A psychiatrist testified that defendant had been in and out of mental hospitals since the age of fifteen, at Dorothea Dix Hospital twelve times, and at about six other mental hospitals. *Id.* at 6, 265 S.E.2d at 179. Again, we find defendant Gibbs' mentality dissimilar.

In addition, we note defendant concedes that in *Penry v. Lynaugh*, 492 U.S. 302, 106 L. Ed. 2d 256 (1989), the United States Supreme Court determined that the Eighth Amendment does not categorically prohibit infliction of the death penalty on a person who is mentally retarded. Defendant has presented no argument based on the North Carolina Constitution.

Defendant Gibbs was convicted on theories both of premeditation and deliberation and felony murder, and there were three homicides. In light of all the cases discussed hereinabove, we cannot say that the three death sentences were excessive or disproportionate, considering both the crimes and defendant.

## NONCAPITAL SENTENCING

[37] Defendant contends the trial court erred by finding duplicative aggravating factors as to his noncapital sentence. Again we disagree.

For purposes of sentencing the court consolidated defendant's convictions of first-degree burglary, conspiracy to commit burglary, and conspiracy to commit murder. The court imposed a fifty-year term of imprisonment, which exceeds the aggregate presumptive sentence for all three offenses. *See* N.C.G.S. § 15A-1340.4(f) (Supp. 1992). Pursuant to N.C.G.S. § 15A-1340.4(a), the court first found as factors in aggravation that defendant induced others to participate in the commission of the offense, N.C.G.S. § 15A-1340.4(a)(1), and occupied a position of leadership or dominance of other participants, *id.*

STATE v. GIBBS

[335 N.C. 1 (1993)]

"This Court has held that both the fact that a defendant induced others to commit a crime *and* his position of leadership may be found as separate, independent factors in aggravation of his sentence 'so long as there is separate evidence to support each.' " *State v. Tucker*, 329 N.C. 709, 726, 407 S.E.2d 805, 815 (1991) (quoting *State v. Erlewine*, 328 N.C. 626, 638, 403 S.E.2d 280, 287 (1991)); *accord State v. Miller*, 315 N.C. 773, 340 S.E.2d 290 (1986); *State v. SanMiguel*, 74 N.C. App. 276, 328 S.E.2d 326 (1985).

In the instant case, evidence that defendant induced others to participate included that he engaged Doris' help in preparing the note, induced her to buy bullets, and instructed her to wake him up. In addition, upon being awakened he instructed Doris to get his hat and gun, a flashlight, and the bullets and told Yvette to find the note. Evidence that he led or dominated others included that he ordered Yvette to accompany him "or else" and loaded the .22 rifle she carried only after they had walked up to the house. In addition, it was defendant who broke the glass in the door and, according to his statement, forced Yvette to act as lookout for him while he shot the victims. Since there was separate evidence to support each factor, we hold there was no duplication error.

We hold defendant received a fair trial and capital sentencing proceeding free of prejudicial error. In comparing his case to similar cases in which the death penalty was imposed, and in considering both the crimes and defendant, we cannot hold as a matter of law that the death penalty was disproportionate or excessive. Similarly, we find no error in the trial court's sentencing of defendant for the noncapital felonies.

NO ERROR.